Albert W. Robson, Appellant, v. Pennsylvania Railroad Company, Appellee.

Gen. No. 44,626.

Opinion filed May 18, 1949.
Rehearing denied June 13, 1949. Released for publication June 17, 1949.

Edward B. Henslee, of Chicago, for appellant; Thomas E. Ryan and Melvin L. Griffith, both of Chicago, of counsel.

THEODORE SCHMIDT, P. J. CRONIN, and HARRY I. PARSONS, all of Chicago, for appellee; FAY WARREN JOHNSON, of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Albert W. Robson filed an amended complaint in the superior court of Cook county against the Pennsylvania Railroad Company, a corporation, for damages on account of personal injuries suffered as the result of a mishap on March 21, 1944, while in the performance of his duties as a fireman, near Renovo, Pennsylvania. He invoked the Federal Boiler Inspection Act basically (secs. 23 and 24, title 45, USCA) and the Federal Employers' Liability Act for form of action. The dereliction alleged was defendant's use of a defective stoker as to parts and appurtenances of a locomotive in interstate commerce. The amended complaint alleged that the defendant violated its duty toward plaintiff in one or more of six ways. The court struck three of these charges, leaving defendant charged with the following dereliction in duty: (a) failure to furnish safe appliances; (b) failure in using ordinary care to furnish a safe place to work; and (c) permitting the mechanism of the stoker to become worn out and defective, as a result of which the neutral gear did not operate and the worm gear revolved when a piece of slate was removed; and that as a direct and proximate result of one or more of the foregoing acts of negligence the plaintiff suffered the injuries described. Defendant answered, denying all of these allegations. At the close of all the evidence, defendant made a motion to strike the testimony of Dr. Turner and Dr. Hamilton, who had testified on behalf of plaintiff. Over the objection of plaintiff this motion was allowed and the jury was instructed to disregard their testimony. A motion then made by defendant for a directed verdict was sustained. Judgment was entered

on the verdict, to reverse which this appeal is prosecuted.

Plaintiff has been a fireman for the defendant since April 1942. On March 21, 1944, he was a fireman on defendant's locomotive No. 4315. His engineer was Charles E. Diber. They were on a run between Renovo and Erie, Pennsylvania, with 60 cars of ore and a pusher engine behind them to help on a grade. This locomotive had what was known as a duplex type of stoker, which is the old type. Elevators to the right and left of the firebox carried the coal to the latter. The coal was brought up from the tender by a conveyor screw. The screw ran in a trough. The stoker engine was fastened to a frame beneath the cab, and a drive shaft coupled onto the screw in the trough back in the coal space in the tender drove coal forward from the tank to the firebox elevators, where steam jets distributed it to the firebox. It took 80 pounds of steam to deliver the coal into the firebox. The conveyor worm was like a big auger with flanges, and as it turned in the trough, coal was brought up to the front. Plaintiff's duty as a fireman was to maintain the proper pressure, take on coal and water, clean the fires and ash pans and take on sand. He described a stoker as a mechanical device for conveying coal from the tender to the engine firebox. The stoker started and stopped with steam, upon application of valves at the fireman's seat. With the steam shut off there was nothing to make the worm gear move; also the gear could be put in neutral by throwing it out of gear, as by a clutch on an automobile. On going to work plaintiff inspected the stoker and found that it had leaky valves. This permitted steam to enter into the stoker engine which rotates the cylinders. One can hear them run even when they are leaking though the valves are shut off. The stoker is hand operated by steam valves. It has three valves. Two of them operate the stoker which takes coal to the firebox by means of the worm

gear. After plaintiff inspected the stoker he reported it to the outbound mechanic. The stoker is operated by a valve. The worm gear is operated by a clutch located beneath the deck of the engine. There is a small plate there which, when lifted, permits access to this lever to place the worm gear in any position required.

Plaintiff noticed that he was not getting coal into the stoker cylinder. He located some slate and stone lodged in the conveyor trough. At this time the train was moving about 25 miles per hour. He then shut off the valves to the engine and placed the worm gear in a neutral position. He first tried to dislodge the obstruction by using a coal pick, which did not work. He said that one cannot get in there with a shovel and get out the slate and stone, and that the only method left is to get it out by hand. In order to do so he had to get down on his knees, reach down in, work it loose and get it out. The stoker was stopped at the time. As he managed to work the clog loose, the worm gear made about six revolutions in a forward motion and then voluntarily stopped. He said the revolutions of the "worm gear caught my hand in there and twisted it around. As it did that, there was a severe jolt in my left arm, which created a terrific pain in the back of my neck and a numbness in my left arm." He reported the occurrence immediately to the engineer and on his arrival at Renovo to Dr. Dwyer, one of defendant's physicians, who looked plaintiff over and examined his neck and arm. Dr. Dwyer did not take any x-rays and sent him back to work. Plaintiff said he was down on his hands and knees for five minutes in unclogging the stoker. His engineer, Charles Diber, controverted this and said if he had engaged in such operation he would have seen and known of it. Diber and plaintiff were the only occurrence witnesses. Locomotive engineers who operated this engine on March 20 and March 21, 1944, stated that with the

stoker in neutral position the worm would not move in either direction. On cross-examination, Mr. Diber testified that if anything becomes lodged in the worm gear of the stoker, it is the fireman's duty to go back and remove it; that the stokers, especially the duplex type, have been stalled by pieces of slate, which happens quite frequently; that the stokers make quite a bit of noise when they are moving; that when they are shut off one does not hear the noise; that when the worm gear is placed in neutral position, if it is working properly, it is supposed to remain stationary; and that pieces of slate and sludge from the stoker are sometimes removed "with what we call a coal pick and sometimes by hand. I have seen that done." This witness also testified that in Renovo plaintiff asked witness where a doctor's office was located; that witness told him; and that the conversation took place in Renovo at the end of the run.

After plaintiff's visit to Dr. Dwyer he worked three days and then laid off about 13 days, during which time he paid regular visits to Dr. Nichols, defendant's doctor at Erie. Dr. Nichols took no x-rays. Plaintiff stated that he continued to get worse and had "awful pain" in the back of his neck and a tingling sensation of numbness in his left arm. He returned to work some time in April and worked irregularly until June 18. His arm kept getting weaker all the time and the tingling sensation was getting stronger. On June 8, while working on a helper engine from Erie to Jackson, he was shaking the grates to clean the fire and something seemed to snap in his neck again. It was the same kind of snap and in the same place as before. His neck got so awfully sore and his arm so much weaker that he went again to Dr. Nichols on his arrival in Erie. Dr. Nichols made an examination and referred plaintiff to Dr. McCarthy, a railroad doctor at Erie, who, after an examination, prescribed heat treatments and massages. Plaintiff continued to get worse and still has

pain in his arm and neck. After that he saw Dr. Nichols about a dozen times and Dr. McCarthy several times. The latter sent plaintiff out to have x-rays taken. After these treatments failed, defendant sent plaintiff to see Dr. Kell at Philadelphia, who had some x-rays taken, but did not tell plaintiff what they showed. The condition continued to get worse and he went to see Dr. Fortune in Erie in November 1945. Dr. Fortune took x-rays and referred him to Dr. Gardner at Cleveland, a nerve specialist, who saw him at the Cleveland Clinic. Dr. Gardner took x-rays. Plaintiff was admitted to the Cleveland Hospital on January 13, 1946. On January 15, 1946, Dr. Gardner operated on his neck. They put him to sleep and about 35 hours thereafter he woke up in his room. He was strapped with tape over his neck and body for about 11 days.

After the operation he felt better. On leaving the hospital he was put in a plaster cast from the waist line to his chin and the back of his head. It stayed on about 3 weeks. He was in the Cleveland Clinic about 15 days. On leaving the hospital with the cast on, he was left under Dr. Fortune's care in Erie. He visited this doctor every two days until the cast was removed. A muslin padded collar was put on when the cast was taken off. It was clamped around his neck and extended from the shoulders so that he could not move his head freely. He continued to go to Dr. Fortune once or twice a week for two months. The last time he saw Dr. Fortune was about May 1946. He went back firing August 9, 1946 and worked until September 1946. Then he again laid off on account of the pain in his neck. This was much lighter work than road work. He never reported for work after that. Defendant eventually issued to him a ''return to duty'' card, and indicated to him that if he did not return to duty he ''was through.'' Since that time he has tried to do several things. He testified that he went out and

tried to plow for a half an hour at a time, but that it did not work out, as it is too much strain on the neck and makes it too sore; that he rode horses three or four times; and that he did some work as overseer around his brother-in-law's riding stable in January 1946. He worked in a gas station a day about every week, or once a month in 1946 or 1947. He earned about $189 at that. He did not receive anything for his work at the riding academy. His monthly pay as a fireman was about $275. He was never injured prior to March 1944, and was in good health then. He has not paid his physician. The operation bill was about $600. As long as it is not too much manual labor his neck feels "pretty good." He testified that he drove his truck and rented it out, but did not do any hauling himself. He bought the truck in April 1948. The material in the truck would be loaded and unloaded by whoever it belonged to. All he did at the gas station was to put the gas in cars. Plaintiff, recalled, testified that he had been mistaken in his original testimony and that it was June 8, 1945 and not 1944 that while shaking a grate of a locomotive he felt something snap again in the neck at the same place. He testified further that the stoker is the screw type approximately 10 feet long, 12 inches in diameter, and revolves on the same order as a meat grinder. Plaintiff acknowledged that a card shown to him reading: "Al Robson Owner-cattle, horses, plowing and general team work," was his, but that he did not do the work on the different jobs, just "helped a little bit."

A deposition of Dr. William J. Gardner of Cleveland was read on behalf of plaintiff. He is a neurological surgeon. After qualifying, he said he saw plaintiff at the Cleveland Clinic on November 6, 1945 and made an examination of his nervous system. He found evidence of a protruded intervertebral disc in his cervical spine. He performed a cervical laminectomy and removed this disc. He saw plaintiff again between January 13

and 26, 1946. He described how the operation was done. The operation relieved the pressure on the nerve root. The x-rays showed that there was some calcification extending beyond the margins of the vertebrae, which indicated to him that it was a response to the trauma to the intervertebral disc. His diagnosis was made from both his history and his findings. X-rays were received in evidence.

Charles E. Diber, called by defendant, testified that he was the engineer; that on March 20, 1944 he did the customary inspection of the engine; and that he described the stoker and its manner of operation. He stated that on that day plaintiff did not report his mishap to him, nor did he see plaintiff down on his hands and one knee with his hands in the trough where the worm gear is located. He testified that the steam will drop if the stoker is stopped for five minutes; that he made defendant's Exhibit 3 on March 22, 1944, which is required by the Interstate Commerce Commission; that he did not inspect the engine when he arrived at Renovo; and that while en route he did make an inspection. He named several defects of the engine, but said none of these had anything to do with the stoker. Over plaintiff's objection he testified that if the fireman had been working on this stoker to remove a lump of coal for five minutes, he would have seen him. The fireman had the duty to operate the stoker. If anything becomes lodged in the worm gear of the stoker, it is his duty to go back and remove it. It happens quite frequently that the stoker is stalled by pieces of slate. When the worm gear is placed in neutral position, if it is working properly, it is supposed to remain stationary. If the valves are turned off, the worm gear is supposed to remain stationary. Pieces of slate and sludge from the stoker are sometimes removed with a pick and sometimes by hand. He had seen that done. The plaintiff at the end of the run asked the engineer where there was a doctor and the

engineer told him. The engineer heard in Erie that plaintiff had been hurt.

J. A. Hughes, a locomotive inspector for 18 years, called by defendant, described engines and stokers generally the same as above. He did not inspect the engine on the day of the occurrence. If the stoker was in neutral and the steam was to leak into the cylinder after the valves were turned off, that would move the gear forward. That would be true if it were in forward position too, that is, if it had steam. The fact that the worm gear moved forward would indicate that steam was leaking into the cylinder. He did not inspect the engine, but did sign the reports on it. E. O. Smith, called by defendant, testified that he is an engineer; that he ran this engine on March 19 and March 20, 1944; that he did not inspect the engine when he was relieved from work; that he had nothing to do with the stoker that run; that he would not know whether or not the stoker was working efficiently that day; and that such information would be "beyond his knowledge." Robert G. Boyd, called by defendant, testified that he has been employed by defendant for a number of years in charge of the engine house operations; that he inspected this engine and stoker on March 21, 1944; that the stoker was then in a working condition; that he tried the stoker valve; that he did not try its clutch; that it was not defective; and that there were no stoker defects marked on the list he had. Robert Carr, called by defendant, testified that he is an engineer; that he has worked for defendant for 32 years; that on March 20, 1944 he operated this engine; that on that trip he had no trouble with the stoker; that if the worm gear is in a neutral position, it will not operate; that he did not know whether the clutch was defective or whether or not the valves were leaking steam in the cylinder when they were shut off; and that the stoker would run with the valves closed if they were leaking. Andrew Cebulski, called by de-

fendant, testified that he is an employee of the Allan Commercial Service, which was engaged by defendant on June 11, 12 and 13, 1947, to investigate plaintiff; that he went to plaintiff's home at 12:45 p.m. on June 11, 1947, but did not see plaintiff until 7:00 p.m.; that witness then left and returned there the following day at 5:30 a.m.; that plaintiff appeared at about 8:30 a.m. and then drove a truck to the R. F. Bowen farm on Route 20; that he there met a boy about 14 years old with a horse which he had ridden to the Bowen farm; that plaintiff with considerable trouble brought a grading shovel to the tail end of the truck; that the boy helped him to lower it to the ground; and that together they pulled it to the field where the horse was. Witness took 150 feet of motion pictures of plaintiff working that day and the next day. Witness did not see plaintiff any more and did not know what he had done on other days. The films were shown to the court and the jury. During the oral argument in this court they were also exhibited. The pictures show plaintiff operating a horse-drawn cultivator, furrowing a field of about 150 yards in length, riding the horse, turning his head right and left as an assistant handled the cultivator, and also as doing neck jerking work with a two-handled grading shovel.

At the outset we are faced with a point presented by defendant that the order appealed from was not a final appealable order in the jurisdictional sense. An additional record which we permitted plaintiff to file, shows that on June 3, 1948, the following judgment order was entered:

"On this day again come the parties hereto and their attorneys respectively, and the jury heretofore impaneled herein for the trial of said cause also come and after hearing all of the evidence adduced say 'We, the jury, find the defendant not guilty.' Judgment is now entered upon said verdict. Whereupon it is considered by the court that the plaintiff, Albert W. Rob-

son, take nothing by his aforesaid action, but that the defendant Pennsylvania Railroad go hence without day and do have and recover of and from the plaintiff his costs and charges in this behalf expended and have execution therefor.''

 The quoted judgment is a proper, appealable final judgment. The directed verdict was returned on June 3, 1948, finding defendant not guilty. From the additional record it appears that the judgment in due form was entered thereon on the same day. On June 10, 1948, pursuant to notice, plaintiff filed a motion for a new trial. On June 28, 1948, the court entered an order denying this motion for a new trial, directing that judgment be entered on the verdict and fixing plaintiff's appeal bond. That part of the order of June 28, 1948, directing that judgment be entered on the verdict, may be treated as surplusage, as judgment had been entered on the verdict on June 3, 1948. Sec. 68 of the Civil Practice Act [Ill. Rev. Stats. 1947, ch. 110, par. 192; Jones Ill. Stats. Ann. 104.068] contemplates the filing of a motion for new trial either before final judgment or within 10 days thereafter, or within such time as the court may allow on motion made within such 10 days. This section also provides that final judgment and execution thereon shall thereupon be stayed until such motion can be heard by the court, and that the time for appeal from such judgment shall not begin to run until the court shall rule upon the motion. The notice of appeal and proof of service were filed on July 15, 1948, in ample time. The notice of appeal recites that it is ''from the judgment rendered and entered in this cause, which judgment in favor of the defendant and against the plaintiff was made final by the order entered June 28, 1948, overruling plaintiff's motion for a new trial,'' and prays that ''said judgment so rendered and entered on the verdict of the jury, as directed by the court, finding

defendant not guilty, together with each and every finding, ruling and order adverse to plaintiff made or entered in said proceedings'' be reviewed and that ''said judgment be reversed and the cause remanded.'' Defendant states that plaintiff appealed from the order of June 28, 1948, which order had the office only of overruling a motion for a new trial and fixing bond. We agree with defendant that an order overruling a motion for a new trial is not a final appealable order. The amended record and the record, however, show that plaintiff appealed from the judgment entered in the instant case and that there was only one judgment entered. It will be observed that the last sentence of par. 1 of sec. 68 of the Civil Practice Act provides that the time of appeal from a judgment shall not begin to run until the court shall rule upon the motion. When the court on June 28, 1948, overruled plaintiff's motion for a new trial, the time within which an appeal could be prosecuted began to run. However, the appeal is from the judgment entered on June 3, 1948. It is apparent that plaintiff's appeal is from the judgment that was entered and not from the order denying his motion for a new trial. In our opinion there was a substantial compliance with the provisions of the Practice Act by plaintiff.

Plaintiff insists that the court committed reversible error in directing a verdict at the close of all the evidence. In deciding such a motion the court has no right to pass upon the credibility of the witnesses, to consider any purported impeachment, the weight thereof, or the weight of the testimony, since the motion admits the evidence in favor of plaintiff to be true, together with all legitimate conclusions and inferences. The question presented by a motion for a directed verdict is whether there is any evidence fairly tending to prove the cause of action or the fact affirmed. The rule known as the ''scintilla of evidence rule'' applies in some jurisdictions,—that is, if there

is even a scintilla of evidence tending to support plaintiff's case the cause must be submitted to the jury,—is not followed in this state. *Knudson v. Knudson*, 382 Ill. 492; *Vieceli v. Cummings*, 322 Ill. App. 559.

The parties are not in disagreement as to the law applicable to the case. Defendant asserts that statements of a plaintiff which are relied on as evidence must have intrinsic merit and probative force to be considered sufficient to raise a conflict in evidence worthy to be resolved by a jury, and that the statements made by plaintiff about the mishap and injuries are not to be classified as testimony with probative force. Defendant states that taking plaintiff's statements and generalizations as a whole, as they pertain to a defective stoker to start with, of its expected or unexpected turning, with the steam power shut off and clutch out of gear, and with no immediate injury or crushing of the skin, fingers, wrist or arm upon six revolutions of the screw, but with indirect physical consequences up in the region of the neck, they do not have content sufficient to induce acceptance to "reasonable minds functioning judicially," as was said by the Supreme Court of Minnesota in *Larsen v. Northern Pac. R. Co.*, 175 Minn. 1, 220 N. W. 159. Defendant also maintains that plaintiff's case may not be sustained by mounting one presumption upon another, and that the directed verdict in its favor was the only proper determination of the case on the whole record.

■■ To entitle plaintiff to recover it was necessary for him to allege and prove that at the time of the occurrence he was carrying on his duties in the ordinary manner, and that defendant either did not furnish him a reasonably safe place to work, or that the stoker violated the Boiler Inspection Act. Proof was offered that he was performing his duty at the time of the occurrence; that the valves that control the steam in the stoker were leaking; that he reported the leaky valves to the outbound mechanic; that he was not get-

ting coal through the stoker; that he located a combination of slate and stone which had lodged in the conveyor trough and was causing the trouble; that when he found this condition he went up and shut off the valves that operate the stoker; that he then tried to dislodge the slate and stone by using a coal pick; that this method did not work; that he then got down on his knees, the only method left, in order to work the slate and stone loose and get it out; that in this manner he managed to work it loose; that as he did the worm gear made about six revolutions in a forward manner; that his hand caught in there and was twisted around; that there was a severe jolt in the back of his neck and a numbness in his left arm; that he reported this immediately to the engineer; that when he finished his run at Renovo he reported immediately to Dr. Dwyer, one of defendant's physicians; that when a stoker is working properly and placed in a neutral position it will remain stationary regardless of whether there is something in it or not; that he worked the next 13 days, during which time he made regular trips to Dr. Nichols, defendant's physician at Erie; that he continued to get worse; and that eventually he was operated on by Dr. Gardner. The mere statement of the facts convinces us that the evidence in the record, taken in the aspect most favorable to plaintiff, entitled him to have the case submitted to the jury. In passing on the motion the court was required to accept the truth of the evidence in favor of plaintiff, together with all legitimate conclusions and inferences. We cannot agree with defendant that plaintiff relied upon presumptions to make out a case.

In the recent case of *Williams v. New York Cent. R. Co.*, 402 Ill. 494, where plaintiff recovered a judgment, which was reversed by the Appellate Court, the Supreme Court in reversing the Appellate Court, said (506):

"In actions under the Federal Employers' Liability Act the rule for measuring the sufficiency and amount

of evidence necessary to justify the submission of the case to the jury is that established by the Supreme Court of the United States, (*Ellis v. Union Pacific Railroad Co.*, 329 U. S. 649, 67 S. Ct. 598; *Brady v. Southern Railway Co.*, 320 U. S. 476, 64 S. Ct. 232,) and it is clear from its recent decisions that the authority of courts to withdraw from the consideration of a jury the question of a defendant railroad company's negligence and its proximate relation to the injury is now very restricted indeed. *Tiller v. Atlantic Coast Line Railroad Co.*, 318 U. S. 54, 63 S. Ct. 444; *Bailey v. Central Vermont Railroad Co.*, 319 U. S. 350, 63 S. Ct. 1062; *Tennant v. Peoria & Pekin Union Railroad Co.*, 321 U. S. 29, 64 S. Ct. 409; *Lavender v. Kurn*, 327 U. S. 645, 66 S. Ct. 740; *Jesionowski v. Boston & Maine Railroad Co.*, 329 U. S. 452, 67 S. Ct. 401; *Ellis v. Union Pacific Railroad Co.*, 329 U. S. 649, 67 S. Ct. 598; *Tiller v. Atlantic Coast Line Railroad Co.*, 323 U. S. 574, 65 S. Ct. 421.

"In the *Tennant case* above cited a verdict and judgment for the death of an employee, where there were no eye-witnesses to the occurrence, had been recovered in the trial court and reversed by the United States Circuit Court of Appeals on the ground that there was no substantial proof that the negligence of defendant was the proximate cause of the employee's death. This judgment of the Circuit Court of Appeals was reversed by the Supreme Court of the United States, and in its opinion in that case, the Supreme Court, after first pointing out that the plaintiff was required to present probative facts from which the negligence and the causal relation could be reasonably inferred, went on to say: 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the

jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusions as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. [Citations.] That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' In the *Ellis case,* the Supreme Court of the United States, said: 'The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. [Citations.] Once there is a reasonable basis in the record for concluding that there was negligence which caused the injury, it is irrelevant that fair-minded men might reach a different conclusion. For then it would be an invasion of the jury's function for an appellate court to draw contrary inferences or to conclude that a different conclusion would be more reasonable.''

''The right to trial by jury is a part and parcel of the remedy afforded railroad workers under the Federal Employers' Liability Act. (*Bailey v. Central Vermont Railway Co.,* 319 U. S. 350, 63 S. Ct. 1062.) To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them. *Blair v. Baltimore & Ohio Railroad Co.,* 323 U. S. 600, 65 S. Ct. 545; *Bailey v. Central Vermont Railway Co.,* 319 U. S. 350, 63 S. Ct. 1062.''

The burden of proving a causal connection was on plaintiff. He introduced competent evidence

which should have been passed upon by the jury. Should the verdict be for plaintiff and the defendant file and argue a motion for a new trial, it would be the court's duty to determine whether under the law and the evidence the verdict should be allowed to stand.

The judgment of the superior court of Cook county is reversed and the cause remanded with directions to proceed in a manner not inconsistent with the views expressed.

*Judgment reversed and cause remanded with directions.*

KILEY and LEWE, JJ., concur.