328 So.2d 249 (1976)
FLORIDA EAST COAST RAILWAY COMPANY, a Corporation, Appellant,
v.
Doris A. LAWRENCE, a Widow, Appellee.
Nos. 74-1408, 74-1409.
District Court of Appeal of Florida, Fourth District.
February 27, 1976.
Rehearing Denied March 30, 1976.
Kenneth L. Ryskamp, of Bolles, Goodwin, Ryskamp & Welcher, P.A., Miami, for appellant.
Arnold R. Ginsberg, of Horton, Perse & Ginsberg and Beckham & McAliley, Miami, for appellee.
MAGER, Judge.
This is an appeal by Florida East Coast Railway Company, defendant below, from *250 a final judgment rendered pursuant to a jury verdict in a consolidated action maintained by Doris A. Lawrence, plaintiff below, as widow and personal representative for the death of her husband resulting from a car-train accident in Brevard County.
Plaintiff sought damages both for wrongful death and under the survival statute asserting that the defendant, among other things, was negligent in the operation and control of its train and in its failure to furnish proper signals and adequate warning of the train's approach to the crossing. The accident occurred at the King Street crossing in Cocoa. The testimony was conflicting with regard to whether the gates at the railroad crossing were in a down position at the time decedent drove his car across the tracks, whether the lights were flashing and whether the train blew its whistle prior to entering into the intersection. The testimony was equally conflicting with respect to whether decedent drove around the gate arm or struck the gate arm as he proceeded to cross the tracks causing the gate to bounce.
The railroad denied any negligence and asserted the defense of contributory negligence. The jury was instructed on the doctrine of comparative negligence. The defendant requested that special verdict interrogatories should be submitted to the jury so that their verdict would reflect the percentages of negligence (thereby reducing the damages in proportion to the amount of the negligence attributable to the decedent). The trial court refused to submit special verdicts to the jury and instead used the general verdict form.
During the course of the presentation of her case the plaintiff called as an adverse witness the superintendent of signals and communications for the defendant railroad. On direction examination of this witness and over the objection of defendant plaintiff introduced into evidence three reported instances of alleged gate malfunctions at crossings other than the King Street crossing within a 90-day period prior to the accident in question avowedly for the purpose of impeachment. Prior to the colloquy leading up to the introduction of these reports, testimony was elicited to reflect that the gate mechanism system at the King Street crossing (and its triggering devices) was fairly standard at each of the crossings within the FEC system, i.e. the gate mechanism system at the King Street crossing would operate in the same manner as at other crossings such mechanism being activated by a train passing a certain point on the track rails. Plaintiff posed the following question to the adverse witness:
"Q All right. With reference to this system of circuitry, can you tell me whether it is possible for a train to come through there and not have any gates, lights, or bell activity until it his the positive circuit?
"A Crossing signal circuits are designed fail-safe, as far as humanly possible. They are maintained to be fail-safe, as far as humanly possible. Anything could happen." (Emphasis added.)
The reports subsequently utilized and objected to by the defendant had been prepared by a signal maintainer for the defendant and related to reported gate malfunctioning some miles distant from the King Street crossing.
In this appeal the defendant contends that the trial court erred when it permitted evidence of prior incidents at other railroad crossings to be considered. Defendant also contends that the trial court erred in refusing to submit special verdicts to the jury on the percentage of fault of each party under the comparative negligence doctrine.
The admissibility of evidence of prior similar accidents was recently discussed in Friddle v. Seaboard Coast Line Railroad *251 Company, Fla. 1974, 306 So.2d 97, wherein the Supreme Court of Florida adopted the dissent in Seaboard Coast Line Railroad Company v. Friddle, Fla.App. 1974, 290 So.2d 85. In the latter Seaboard, supra, at page 89, the opinion pointed out the purpose to be served by such evidence as well as the circumstances surrounding its admissibility:
"`... Evidence of prior similar accidents at the same place, or prior similar injuries resulting from the same appliance, as that of the accident or injury in suit, is generally admissible for the purpose of showing the existence of dangerous or defective premises or appliances, and notice or knowledge thereof, but generally not for the purpose of showing specific acts of negligence or the cause of the accident or injury. The admission of evidence of prior accidents or injuries is an exception to the general rule which ordinarily excludes evidence of independent events and occurrences not directly connected with the matter in dispute.'
* * * * * *
"The foregoing authorities, and particularly the cases cited in the annotation and the supplement thereto, reflect that evidence of prior and subsequent accidents is admissible: (1) where the accidents occurred at the same place and under conditions which were at least substantially similar to the accident in dispute; (2) where the similar accident evidence has some tendency to establish a dangerous or defective condition at the place in question; (3) where the offer of evidence is to prove not negligence but notice of the dangerous character of the condition; (4) where the evidence of the similar accidents offered to establish the existence of a dangerous condition is not too remote in time to the accident or condition to which such other accidents are claimed to be similar."
A prevalent and vital aspect of the admissibility of prior similar accidents has been the occurrence of such accidents "at the same place" particularly with respect to an accident at a railroad crossing. 46 A.L.R. 2d 935, annotation: Evidence  Railroad Crossing Accident; 70 A.L.R.2d 167, annotation: Evidence  Negligence  Prior Accidents. See also Davis v. Illinois Terminal Railroad Company, Mo. 1956, 291 S.W.2d 891; Atchison, T. & S.F. Ry. Co. v. Aynes, Okl. 1954, 271 P.2d 312; Seaboard Coast Line Railroad Company v. Friddle, supra; Southern Railway Company v. Lanham, 5 Cir.1968, 403 F.2d 119. In the instant case, the prior similar accident evidence had reference to places other than the crossing where the subject accident occurred.
We fail to perceive the distinction drawn by the plaintiff between prior similar accidents and prior similar incidents insofar as the question of admissibility is concerned. In our view the criteria set forth in Seaboard, supra, would be equally applicable to prior similar incidents involving malfunctioning safety devices as it is to prior similar accidents. If the purpose of utilizing prior similar accident or incident evidence is to show the existence of a dangerous condition and notice or knowledge thereof the general guidelines set forth in Seaboard must be met.
The reports in question are not only deficient in this respect, i.e. a failure to show a malfunctioning at the place of the accident in question, but, additionally, these reports fail to reflect occurrences "under conditions which were at least substantially similar" to the accident in question. Seaboard v. Friddle, supra.
The annotation dealing with the admissibility of evidence involving railroad crossing accidents contains perhaps the best recitation of the rule and its application:
"The relatively few cases involving the present subject indicate that in a railroad crossing accident case, evidence of other functional failures of the warning signal located at the crossing in question *252 when the accident occurred, occurring either before or after the accident in suit, may be admitted in a proper case for the purpose of showing the failure of the signal to operate at the time of the accident; or to show the defendant railroad's knowledge of the disrepair of the signals; or to throw light on the contributory negligence of the plaintiff; or to rebut specific evidence of the defendant railroad, such as an inference to the effect that since the warning signal at the crossing where the accident occurred was inspected a short time before and after the accident in suit, and was found to be in perfect working order, the signal must have been working properly at the time of the accident.
"But the admissibility of such evidence is strongly affected by the similarity or dissimilarity between the conditions prevailing at the time of the accident in suit and the conditions prevailing with respect to the particular signal (whether that at the crossing involved or at some other crossing) to which the evidence as to other functional failures is directed. Thus, it has been held or recognized in a few cases that such evidence was not admissible because its was too remote in point of time, or because the conditions were dissimilar at the railroad crossing at the time of the accident in suit and that the time or with respect to the signal device referred to in the testimony. Admissibility may also be affected by the form in which the testimony is offered." (46 A.L.R.2d 936)
While there is arguable merit to the plaintiff's proposition that evidence of prior similar incidents (or accidents) involving safety appliances at other railroad crossings is admissible for impeachment purposes to diminish or discredit the "aura of infallibility" of the system, we are of the opinion that the particular factual circumstances surrounding the presentation of the objectionable reports do not support the application of the position suggested by the plaintiff.[1] In particular, the adverse witness's response conceded the fallibility of the system, i.e.:
"A Crossing signal circuits are designed fail-safe, as far as humanly possible. They are maintained to be fail-safe, as far as humanly possible. Anything could happen." (Emphasis added.)
To that extent, therefore, the utilization of the reports appeared to be somewhat contradictory to the purpose for which such reports were sought to be used. Moreover, while not dispositive of the question of admissibility for the principle advocated by the plaintiff it is interesting to note that the reports were utilized for impeachment during the questioning by the plaintiff of his own "adverse" witness rather than as a rebuttal to or during cross-examination of a defense presentation. Cf. Foremost Dairies, Inc. of South v. Cutler, Fla.App. 1968, 212 So.2d 37.
The instant situation is strikingly similar to the circumstances present in Atchison, supra. There the plaintiff introduced evidence concerning the operating failure of the same type of signal device at a crossing other than where the accident occurred, presumably to diminish the "aura of infallibility". In concluding that such evidence was inadmissible the Supreme Court of Oklahoma observed:
"We think it clear the admission in evidence of this testimony respecting the operating failure of a crossing signal at a different location, and at an indefinite time, was seriously prejudicial to defendant's case. Although defendant conceded the possibility of such failure occurring, *253 the jury readily could have been impressed by this testimony to the extent of concluding that the general unreliability of defendant's warning signal was shown. In the guise of being admitted as rebuttal testimony even though upon an issue which had been conceded such evidence could, when carried to the extreme, be declared admissible even though concerned with similar occurrences so far removed from the scene of the alleged negligence, as to make any connection or comparison ridiculous. The defendant was charged with negligence in certain particulars at a specified point. In whatever respects defendant might have been guilty of negligence at other places and times, it remained for plaintiff to recover upon the strength of his evidence as concerned the particular event. Evidence of unrelated incidents could not establish plaintiff's case, and no justification appears for requiring defendant to defend against them. This was a close case and the evidence upon the issue of failure of the warning signal appears evenly balanced. Submission of the objectionable evidence for the jury's consideration undoubtedly permitted the jury to infer that since there was evidence of one failure it was probable this accident resulted from another failure of the warning signal. Acts or omissions which are claimed as negligence cannot be shown in such a manner.
"Judgment reversed and case remanded with directions to grant a new trial."
As heretofore noted, evidence of the gate malfunction was conflicting and somewhat evenly balanced so that the evidence of malfunctions at other crossings conceivably could have tipped the scales in favor of the plaintiff. We have no way of knowing whether it actually did; but it does appear that such evidence was highly prejudicial to the defendant so as not to be characterized as "harmless error" thereby requiring a reversal and necessitating a new trial.
Although our reversal is predicated primarily upon the foregoing we are of the opinion that the remaining appellate issue ought to be resolved in favor of the defendant without necessarily concluding that reversible error has occurred with respect to such remaining issue. As heretofore stated, the defendant requested and the trial court refused to submit special verdicts to the jury on the question of the fault of each party. The defendant contends that this was error and we are inclined to agree.
The adoption of comparative negligence demonstrates a realization by this court and the Supreme Court of the need to establish and apply a more equitable system of recovery that would best achieve justice as between parties who are both at fault. Jones v. Hoffman, Fla.App. 1973, 272 So.2d 529, and Hoffman v. Jones, Fla. 1973, 280 So.2d 431. At the very heart of the adoption of comparative negligence was the pragmatic recognition that juries invariably "balanced" the negligence of the parties to ultimately arrive at a fair result and a reaffirmance of the principle that the jury system was capable of keeping pace with any such change. If, therefore, we have admonished the jury to continue to do that which it was doing anyway but to do so "in the open" as a recognized and standardized practice, assuredly the jury is capable of spelling out its verdict with percentile specificity, i.e. delineating the degree of negligence of each party in a percentage form.
Presently, where the evidence reflects the existence of contributory negligence the jury is charged on the comparative negligence principle and is directed to "apportion fault as it sees fit between negligent parties" and to "apportion the total damages resulting from the loss or injury according to the proportion of fault of each party", Hoffman v. Jones, supra, at 439. By adopting a system of special verdicts we can ascertain whether the comparative negligence principle is actually being *254 applied. We can determine with some degree of reliability whether comparative negligence is a living and practicing doctrine or merely a lofty concept without pragmatic results.
Our review of the case law in Florida does not reflect any definitive determination by any court on this precise issue. The particular point involved in this appeal has never been squarely presented to any court; there have been expressions by the Supreme Court in Hoffman v. Jones, supra, and recently in Lincenberg v. Issen, Fla. 1975, 318 So.2d 386, concerning the utilization of special verdicts which must be characterized as dicta inasmuch as those expressions had no bearing upon the issue involved in those decisions.
In Hoffman v. Jones, supra, the Supreme Court astutely recognized the necessity to gauge the jury's proper application of the comparative negligence rule and made the following general observation:
"In accomplishing these purposes, the trial court is authorized to require special verdicts to be returned by the jury and to enter such judgment or judgments as may truly reflect the intent of the jury as expressed in any verdict or verdicts which may be returned." (280 So.2d at 439)
In Lincenberg, the Supreme Court was concerned with the "no contribution" principle and concluded that its application lost its viability "in light of Hoffman and public policy" and that henceforth "payment should in justice be shared by another who shared the responsibility for the injury". The trial court in Lincenberg utilized a special interrogatory verdict on a horizontal basis, i.e. the plaintiff was not guilty of any negligence and the special interrogatories sought to require the jury to apportion the percentage of negligence between the multiple defendants.
The Supreme Court, however, observed that in light of the newly adopted Uniform Contribution Among Joint Tortfeasors Act (768.31, F.S.) the relative degrees of fault of the defendants for the purpose of contribution among and between themselves may not be considered because the act provided for contribution on a pro rata basis. The court, however, made the following observations with regard to special verdicts:
"While special verdicts such as that utilized by the trial court, sub judice, on the degrees of fault are not dispositive of the issue of contribution in view of Section 3(a), such special verdicts may be desired and of assistance to the trial judge in performing his equity responsibility under Section 3(c). To that end and for that purpose only, the trial judge may in his discretion request special verdicts on the degrees of fault. These special verdicts if employed for equity considerations under Section 3(c) would be a determination on a vertical basis of the liability as between plaintiff and the several defendants and horizontally among the multi-party defendants. Vertical apportionment to be determined by the jury is explained in Hoffman, supra, as follows:
`If plaintiff and defendant are both at fault, the former may recover, but the amount of his recovery may be only such proportion of the entire damages plaintiff sustained as the defendant's negligence bears to the combined negligence of both the plaintiff and the defendant. For example, where it is found that the plaintiff's negligence is at least equal to that of the defendant, the amount awarded to the plaintiff should be reduced by one-half from what it otherwise would have been.'
"The plaintiff is entitled to a measurement of his full damages and the liability for these damages should be apportioned in accordance with the percentage of negligence as it relates to the total of all the defendants. The negligence attributed to the defendants will then be apportioned on a pro rata basis without considering *255 relative degrees of fault although the multi-party defendants will remain jointly and severally liable for the entire amount."
However, both Hoffman and Lincenberg were not presented with the specific proposition as to whether the court was required to submit special verdicts to the jury to determine vertical apportionment (as between plaintiff and defendant) where a party specifically requests the trial judge to submit special verdicts.
A discussion of the necessity for the use of special verdicts is contained in Maloney, From Contributory to Comparative Negligence; a Needed Reform, 11 U.Fla.L.Rev. 135, 170-3 (1958); Timmons and Silvis, Pure Comparative Negligence in Florida, 28 U.Miami L.Rev. 737, 800 (1974); Prosser, Comparative Negligence, 51 Mich.L. Rev. 465 (1953); see also Schwartz, Comparative Negligence (1974), sec. 174; 32 A.L.R.3d 463, 492, annotation: Negligence  Comparative  Contributory. All of the treatises recognize that the special verdict will serve to insure that the comparative negligence law achieves its desired goal of apportioning damages on the basis of fault. The treatises also recognize that in addition to the equitable considerations there is a practical need for special verdicts, e.g. it puts the mathematical computations in the hands of the judge rather than a jury and provides a means for appellate review of these computations. As additionally pointed out in the University of Miami Law Review article at page 802:
"Prosser observed three main reasons for the adoption of special verdicts in conjunction with the adoption of comparative negligence: (1) it allows for the correction of jury error (a remittitur may save a new trial); (2) it forces detailed consideration by the jury rather than allowing it to jump to a conclusion on a `gut reaction'; and (3) it enables the court to avoid the necessity of using long, complicated jury instructions which would open the door to reversible error." (28 U.Miami L.R. at 802)
It is particularly interesting to note the observations made by one textwriter that of the ten states following comparative negligence wherein special verdicts are specifically provided for, four of the states require a special verdict in every case where contributory negligence is an issue; in the other six, a special verdict may be required in the discretion of the court and must be required upon timely request made by any party. See Schwartz, Comparative Negligence, supra.[2]
Since Florida and now California (Nga Li v. Yellow Cab Company of California, 13 Cal.3d 804, 119 Cal. Rptr. 858, 532 P.2d 1226 (1975)) have adopted comparative negligence by judicial decree we perceive no impediment to judicial implementation of the required use of special verdicts where contributory negligence is an issue either in the discretion of the court or where timely requested by any party.
Although we are of the view that our determination is consistent with the comparative negligence principle as set forth in the Hoffman and Lincenberg cases and we perceive no conflict with the aforementioned decisions, it is nevertheless our intention to certify the special verdict question to the Supreme Court as one involving a question of great public interest so that the bench and bar may have the benefit of an authoritative decision of statewide application. Cf. Beta Eta House Corporation v. Gregory, Fla.App. 1970, 230 So.2d 495. The question to be certified is
Whether the adoption and application of the principle of comparative negligence requires the submission of special verdicts to the jury on the percentage of *256 fault of each party (plaintiff and defendant) where either party requests the submission of special verdicts.
Reversed.
CROSS, J., concurs.
DOWNEY, J., concurs in part and dissents in part, with opinion.
DOWNEY, Judge (concurring in part, dissenting in part).
I concur generally with the position taken by the majority relative to the admissibility of evidence of system malfunctions at railroad crossings other than the crossing involved in the accident in question. However, I deem it advisable to make it clear that in a proper case such evidence could become admissible if the circuitry, lights, gates, and other equipment were virtually identical to the circuitry and equipment at the crossing in question, and the railroad asserts the system will not malfunction. This would be the most relevant kind of impeachment. Here we have crossings with similar circuitry, but each crossing has separate and distinct circuits, and some crossings have circuits with varied modifications. In addition, the witness to be impeached did not testify the system was infallible. He asserted it was designed and maintained to be "fail-safe" but acknowledged that anything could happen. Thus, there was no predicate for the evidence of malfunctions at other crossings.
I also agree with the majority that special verdicts are desirable, particularly today in view of the recent evolution of tort law in this state. However, I would be most reluctant to reverse a trial judge for failing or refusing to require special verdicts in view of the current status of the law on that question.
As far back as 1909 the Supreme Court of Florida said: "The court is not justified in directing the jury to find a special verdict, though it may, in its discretion, in a proper case recommend one." Florida East Coast Ry. Co. v. Lassiter, 58 Fla. 234, 50 So. 428, 430 (1909). Then in Hoffman v. Jones, Fla. 1973, 280 So.2d 431, the Supreme Court suggested the trial court had the discretion to require the jury to return special verdicts when it said "the court is authorized to require special verdicts to be returned." 280 So.2d at 439 (emphasis added). More recently in Lincenberg v. Issen, Fla. 1975, 318 So.2d 386, that court said "the trial judge may in his discretion request special verdicts on the degree of fault." 318 So.2d at 393. (emphasis added). So, one might ask what is the trial judge to do?
It seems clear to me the use of special verdicts in tort cases should be standard practice in Florida. But standardization throughout the state should emanate from the legislature or the Supreme Court, as may be appropriate to the subject matter involved.
I further agree that the question should be certified.
NOTES
[1] Interestingly, Davis v. Illinois Terminal, supra, relied upon by the plaintiff for the proposition of rebutting infallibility involved and was concerned with the malfunctioning of signal devices at the same crossing at which the accident occurred. See also Southern Railway Company v. Lanham, supra.
[2] The typical special verdict would require the jury to state: (1) the amount of damages which would have been recoverable if there had been no contributory negligence; and (2) the degree of negligence of each party, expressed as a percentage.