LARRY JOHNSON, Adm'r of the Estate of Cory Johnson, Deceased, *et al.*, Plaintiffs-Appellants, v. DAN O'NEAL, Special Adm'r of the Estate of Michael O'Neal, Deceased, *et al.*, Defendants-Appellees (The County of McLean, Defendant).

Fourth District   No. 4—90—0617

Opinion filed July 25, 1991.

LUND, P.J., specially concurring.

Eileen O'Sullivan, of Jerome Mirza & Associates, of Bloomington, for appellants.

Guy C. Fraker and John T. Echols, both of Costigan & Wollrab, P.C., of Bloomington, for appellee Dan O'Neal.

W. Thomas Johnston and Paul P. Gilfillan, both of Quinn, Johnston, Henderson & Pretorius, of Peoria, for appellee Lexington Township.

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiffs, Larry Johnson, as administrator of the estate of Cory Johnson, deceased (decedent), and Larry Johnson and Patricia Johnson, in their individual capacities, appeal a judgment entered in an action for wrongful death (Ill. Rev. Stat. 1985, ch. 70, pars. 1 through 2.2), survival (Ill. Rev. Stat. 1985, ch. 110, par. 2—1008(b); ch. 110½, par. 27—6), and family expense (Ill. Rev. Stat. 1985, ch. 40, par. 1015), arguing that the damages awarded them are inadequate. The principal issues on appeal are (1) should computational verdict forms be provided to the jury in all comparative negligence cases, and (2) does the prayer for relief contained in a notice of appeal control the issues which may be adjudicated in a new trial.

## I. PROCEDURAL HISTORY

In November 1986, this action commenced when plaintiffs filed a complaint against the special administrator of the estate of decedent

Michael O'Neal (O'Neal's estate), the County of McLean, and Lexington Township (the township). On November 4, 1988, summary judgment was entered in favor of the County of McLean, and it is not a party to this appeal.

Amended complaints were filed, and trial ultimately was held on plaintiffs' fourth-amended complaint, filed in December 1989. Common to all counts of that complaint are allegations that on December 13, 1985, decedent was a passenger in a car driven by Michael O'Neal, and decedent sustained injuries when the car went off the road in the area of a curve, rolled over, and came to rest in a field. The complaint alleged that the injuries caused by this crash ultimately resulted in decedent's death. The first three counts of the complaint alleged that O'Neal was negligent because he (1) drove his car too fast for conditions, and (2) failed to keep his automobile under proper control. These counts alleged that O'Neal's negligence proximately caused the decedent's injuries and death. Count I sought damages on a wrongful death theory; count II requested compensation for decedent's medical, hospital, and funeral expenses (under the family expense theory of recovery); and count III sought damages for decedent's pain and suffering prior to his death.

Counts IV through VI were directed against the township. These counts alleged the township owned or maintained the road on which the fatal accident occurred. These counts further alleged that because of the number and severity of curves in the road in the area of the accident, the road was dangerous for travel at the posted or permitted speed, and that the number and severity of the curves was not readily apparent to a motorist traveling the road. Plaintiff alleged the township negligently breached its duty to exercise due care in erecting and posting signs and in warning motorists of hazards on the road in that the township (1) failed to correctly identify the number of curves in the road, (2) failed to post a safe speed or reduce the speed limit on the road in the area where the accident occurred, and (3) failed to advise motorists of the severity of curves in the road and the speed at which the curves could be safely traveled. Plaintiffs alleged this negligence proximately caused decedent's injuries and death. Count IV sought damages on a wrongful death theory; count V requested reimbursement for decedent's medical, hospital, and funeral expenses; and count VI requested damages for decedent's pain and suffering prior to death.

On February 19, 1990, plaintiffs and O'Neal's estate entered into an agreement under which the estate agreed to pay plaintiffs $600,000. The first $300,000 of this amount was a loan, repayable

only to the extent plaintiff recovered that amount or a lesser sum from the township. This agreement did not preclude plaintiffs' claims against O'Neal's estate from proceeding to trial, and it provided that if plaintiffs obtained a judgment against O'Neal's estate in an amount in excess of $600,000, O'Neal's estate was to pay the excess amount to the extent it did not exceed $50,000. Otherwise, O'Neal's estate was not required to make any further payments to plaintiffs.

On February 22, 1990, O'Neal's estate moved for (1) a finding of good faith as to the loan receipt agreement, (2) dismissal of the township's counterclaim against O'Neal's estate, (3) dismissal of O'Neal's estate's counterclaim against the township, and (4) O'Neal's estate's discharge from any liability for contribution to the township. On February 23, 1990, the circuit court entered an order granting the relief requested in this motion, and the two counterclaims involving O'Neal's estate and the township were dismissed with prejudice.

In March 1990, the township filed an affirmative defense to the plaintiffs' complaint, alleging that decedent was guilty of negligence which proximately caused his injuries and death in that he negligently and carelessly (1) stayed in a vehicle being operated by a person whom he knew or should have known was driving at dangerous and excessive speeds; (2) encouraged the driver to operate the vehicle at such speeds; and (3) failed to remove himself from a vehicle being operated at dangerous and excessive speeds, although there were opportunities to do so.

## II. The Trial

The jury trial of this cause was held in March 1990. The plaintiffs' first witness was Richard Freed, who was a police officer with the City of Lexington at the time of the fatal accident. Freed testified that on the evening of December 13, 1985, he received a citizen's band radio report of an accident on a county or township road south of Lexington. At a curve in the road, he discovered a car lying in a field. He found four victims at the accident scene. One boy in the car was alive, and there was another boy on the ground who was also alive, with a dead boy on top of him. Subsequently, Freed discovered a dead girl at the accident scene. Freed further testified that a driver traveling south on the road on which the accident occurred (in the direction of the place of the accident) would come upon the crest of a hill and see one curve, but would not be able to see a second curve which follows. The accident occurred at the second curve.

Also testifying on behalf of plaintiffs was Chris Juvenal. Juvenal stated that on the evening of the accident, decedent and O'Neal

picked him up at his residence. At that time, Juvenal was 15 years old. Juvenal testified that O'Neal had a new car and had obtained his driver's license the day before. Juvenal, O'Neal, and decedent then picked up Cathy Quinn and "just drove around." Eventually, the group wound up in the country and saw the lights from a town, which turned out to be Lexington. After arriving in Lexington, the passengers changed positions in the car, with Juvenal moving from the back seat to the front seat and decedent moving from the front seat to the back seat. The group then drove around Lexington to "kind of get our bearings" and subsequently drove out of town. Juvenal recalled few details of the accident; he remembered seeing some grain bins, "coming to in the car for a brief period of time," and seeing the ambulance arrive.

On cross-examination by counsel for the township, Juvenal testified that during the evening in question, O'Neal was driving at "[m]aybe between 70 and 80," but then stated, "I really don't know." Juvenal also testified that while the car was stopped in Lexington, no one said anything about O'Neal's driving. Juvenal acknowledged that six days after the accident, he signed a voluntary statement in which he said that he and the three other youths entered Lexington on the same road on which the accident occurred. However, at trial, Juvenal testified that the accident did not occur on the same road. Juvenal stated that he signed the voluntary statement before he returned to the scene of the accident "to see how curvey the actual road was."

Rhonda Bennett testified on behalf of plaintiffs that in August 1980, when she was 16 years old, and shortly after she obtained her driver's license, she was involved in an accident at the same location as the accident in which decedent was killed. She stated the car that she was driving went out of control on a curve, became airborne, and went into a bean field.

Also testifying on behalf of plaintiffs was Jeff Elston, an officer with the McLean County sheriff's department assigned to the detective division. Elston testified that on November 23, 1985, another one-car accident occurred at virtually the same location as the accident in which decedent was killed. The November 1985 accident occurred when the driver lost control on the curve. The car skidded into a ditch and subsequently vaulted into a field, where it rolled over twice before coming to a stop.

Both Patricia and Larry Johnson testified concerning their relationship with decedent, decedent's character and school record, and their presence at the hospital with decedent after the accident. Larry Johnson stated that decedent died on February 1, 1986. Plaintiffs also

presented medical testimony relevant to the survival claims for damages for decedent's pain and suffering after the accident and prior to his death.

The trial court denied motions for directed verdicts by both the township and O'Neal's estate at the close of plaintiffs' case.

Bonnie Serone, a McLean County sheriff's deputy, testified on behalf of the township. Serone stated that based on her investigation of the accident scene, the vehicle in which decedent was riding was traveling at 65 miles per hour when it left the road.

The township also presented medical testimony relevant to the survival claims.

No evidence was presented on behalf of O'Neal's estate.

At the conclusion of the evidence, the trial court denied (1) a motion by plaintiffs for a directed verdict finding that decedent was not guilty of contributory negligence, (2) a motion for a directed verdict in favor of O'Neal's estate, and (3) a motion for a directed verdict in favor of the township.

At the jury instructions conference, the circuit court refused a jury instruction which consisted of a computational verdict form on which the jury could have indicated the percentage by which it found decedent guilty of comparative negligence. The court refused this instruction because it did not contain signature lines for the jurors. Counsel for the township indicated he would retender this instruction, but the record contains no indication that he did so. The jury was nevertheless instructed, in part, as follows:

> "It was the duty of the plaintiff [sic], before and at the time of the occurrence, to use ordinary care for his own safety. The failure of a person to use ordinary care for his own safety is known as contributory negligence.
>
> Plaintiff's [sic] contributory negligence, if any, does not bar his recovery. However, the total amount of damages to which he would otherwise be entitled is reduced in proportion to the amount of his negligence. This is known as comparative negligence." O'Neal's Estate's instruction No. 2.
>
> "Involved in this lawsuit are three distinct claims against each defendant; one by the estate of Cory Johnson which seeks damages for his claimed conscious pain and suffering, one by his father and mother who seek compensation for money spent or amounts for which they have become liable for reasonably necessary doctor bills and hospital bills, and the other by the estate of Cory Johnson [sic] which seeks damages for loss of society.

If you should find that the plaintiffs' decedent's conduct amounted to contributory negligence, then the amount of money damages to which the estate or the parents would otherwise be entitled must be reduced in proportion to the amount of negligence attributable to the plaintiffs' decedent." Township's instruction No. 6.

At the conclusion of the trial, the jury returned a verdict in favor of plaintiffs and against both defendants as to counts I and IV (wrongful death) in the amount of $200,000, as to counts II and V (hospital, medical, and funeral expenses) in the amount of $50,000, and as to counts III and VI (conscious pain and suffering prior to death) in the amount of $0.

On April 18, 1990, plaintiffs filed a post-trial motion requesting (1) entry of a judgment *n.o.v.* in their favor on the issue of decedent's comparative fault, (2) a new trial as to damages only, or, alternatively, (3) entry of an *additur* in the amount of $132,334.49. The *additur* which plaintiffs requested is the difference between the jury's award for decedent's hospital, medical, and funeral expenses ($50,000) and the undisputed amount of those expenses established at trial ($182,334.49).

On April 23, 1990, the township filed post-trial motions requesting (1) entry of a judgment *n.o.v.* in its favor, (2) that the unconditional portion of the payment to plaintiffs by O'Neal's estate pursuant to the loan agreement be set off against the judgment entered against it, and (3) in the event of entry of an *additur* against the township, a setoff against the *additur* of the remaining amount of the unconditional payment to plaintiffs by O'Neal's estate plus the forgiven portion of the loan which O'Neal's estate made to plaintiffs.

At the hearing on the post-trial motions, the trial court indicated that decedent's conscious pain and suffering after the accident was "clearly a fact issue" to be determined by the jury. With respect to the issue of decedent's comparative fault, the trial court stated:

"At any rate, the verdict form does not contain the special interrogatories for finding what the verdict would have been had there been no contribuotry [sic] negligence, and then the percentage of contributory negligence of Plaintiffs' Decedent, and then the reduced net verdict amount. That was not an option which was given to the Jury in this case, and I think that at this stage in the trial that all intendments have to go in favor of the Jury's verdict, and that the Court must presume that they acted upon the evidence which they heard in returning the verdict that they did.

So while I concede that there are uncontested medical bills and funeral bills in excess of $50,000, there is the possibility that the Jury found an element of contributory negligence on the part of the Plaintiffs' Decedent."

In an order entered July 27, 1990, the trial court (1) denied plaintiffs' post-trial motions, (2) denied the township's post-trial motion for judgment *n.o.v.*, and (3) allowed the township's post-trial motion for a setoff against the verdict returned against it in the amount of the unconditional portion of the payment which O'Neal's estate made to plaintiffs. The trial court further ruled that the township's post-trial motion requesting a setoff against any *additur* entered against it was moot.

On August 23, 1990, plaintiffs filed a notice of appeal from the judgment entered on the jury's verdict and from the order which denied their post-trial motion. In their notice of appeal, plaintiffs request (1) entry of a judgment *n.o.v.* on the issue of decedent's comparative fault, (2) a new trial on the issue of damages only, or, alternatively (3) entry of an *additur* with respect to medical and funeral expenses in the amount of $132,334.49.

### III. JUDGMENT *N.O.V.*—DECEDENT'S COMPARATIVE FAULT

Plaintiffs first argue that the trial court erred in denying them a judgment *n.o.v.* on the issue of decedent's comparative fault. Plaintiffs contend that, viewed in a light most favorable to defendants, the evidence so overwhelmingly favors plaintiffs that no finding of comparative fault on the part of decedent could ever stand. In support of this argument, plaintiffs contend that evidence as to the unsafe speed of the vehicle in which decedent was riding prior to its arrival in Lexington was too remote and speculative to serve as a basis for imposing a duty on decedent to remove himself from the vehicle. Furthermore, plaintiffs argue that even if the evidence establishes the car was being driven at an excessive speed, it was not reasonable to expect decedent, who was only 15 years old and did not have a driver's license, to remove himself from the car when he was some distance from his home in Bloomington.

The township asserts there is ample evidence of decedent's comparative negligence to create a jury question on that issue. The township argues that Illinois law recognizes (1) a passenger in an automobile may be guilty of contributory negligence in failing to exercise due care for his or her own safety, and (2) events occurring hours before an accident may be relevant to the issue of the comparative fault attributable to a party.

In their reply argument, plaintiffs contend that Deputy Serone's testimony pertaining to vehicular speed is irrelevant to the issue of decedent's comparative fault.

■ Judgments *n.o.v.* should be entered only in those cases in which all of the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) We agree with the township that evidence that a party rode for a fairly lengthy period of time in a speeding vehicle creates a jury question as to whether that party exercised due care for his own safety. Moreover, when a jury has evidence that a vehicle was speeding just before an accident, the jury may infer that the speeding had been continuous. See *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 566-67, 382 N.E.2d 239, 242.

Deputy Serone testified that the vehicle in which decedent was riding was traveling at 65 miles per hour when it left the road. Contrary to plaintiff's contention, this testimony is relevant to the issue of the decedent's comparative fault. The jury was instructed:

> "Defendant Lexington Township claims that the plaintiff [*sic*] decedent was contributorily negligent in failing to remove himself from a vehicle which the driver was operating at excessive and dangerous rates of speed.
>
> Defendant Lexington Township further claims that the foregoing was a proximate cause of the plaintiff [*sic*] decedent's injury and death." (Plaintiffs' instruction No. 8.)

Deputy Serone's testimony was probative as to the issue of whether O'Neal was speeding on previous occasions during the evening of the accident, and this in turn was relevant to whether decedent was guilty of comparative negligence because he failed to remove himself from a speeding vehicle.

■ Given the inferences which the jury could reasonably have drawn from Deputy Serone's testimony, the evidence is sufficient to permit a jury to find *some* comparative fault on the part of decedent. From this testimony, the jurors could properly have inferred that the vehicle in which decedent was a passenger had been speeding prior to its arrival in Lexington. The jurors could have further concluded that decedent should have removed himself from the vehicle during its stop in Lexington, telephoned his parents or someone else in Bloomington, and requested that they pick him up. Thus, as to the issue of decedent's comparative fault, the evidence, viewed in a light most favorable to defendants, does not so overwhelmingly favor plaintiffs

that no finding of comparative fault on decedent's part could ever stand.

## IV. NEW TRIAL—*ADDITUR*

Plaintiffs maintain they are entitled to a new trial as to damages only because (1) the damages awarded in this case are manifestly inadequate, (2) proved elements of damages were ignored, and (3) the amount of the damages award bears no reasonable relationship to the loss which plaintiffs suffered. Plaintiffs note that the jury awarded only $50,000 for hospital, medical, and funeral expenses, when uncontroverted evidence established that the total expenses which they incurred for these items was $182,334.49. Moreover, plaintiffs contend the award of no damages on the survival counts for decedent's pain and suffering after the accident is contrary to the manifest weight of the evidence, in view of testimony that after the accident and before his death, decedent responded to oral commands and to painful stimuli and showed signs of purposeful activity.

Plaintiffs alternatively argue that given the alleged inadequacy of the jury's damages award, the circuit court should have entered an *additur* in their favor. Plaintiffs assert that the premise on which the circuit court essentially relied in denying their request for an *additur*—that plaintiffs' decedent was 72.6% at fault—is irrational and impermissible as a matter of law.

The township contends the evidence is generally sufficient to support the jury's awards of damages, and the $50,000 award for hospital, medical, and funeral expenses reflects a reduction in damages to account for decedent's comparative negligence. The township also asserts that because there is a close question as to its liability, a new trial as to damages only would be grossly unfair.

### A. *Computational Verdict Forms*

In considering the adequacy of the damages awards, we must first determine whether the evidence suffices to support a finding of 72.6% comparative fault on decedent's part, which the circuit court apparently concluded was implicit in the jury's verdict. Our review of this question is made difficult by the trial court's failure to provide the jury with a computational verdict form on which it could have entered a finding as to the percentage of fault attributable to decedent. Absent such a verdict form, there must necessarily be some speculation as to the amount of negligence which the jury attributed to the parties.

■ Some prior decisions of this court and the appellate courts of other districts hold that failure to provide the jury with computational verdict forms in comparative negligence cases is not reversible error. (*E.g., Harris v. Day* (4th Dist. 1983), 115 Ill. App. 3d 762, 773, 451 N.E.2d 262, 268; *Hazelwood v. Illinois Central Gulf R.R.* (4th Dist. 1983), 114 Ill. App. 3d 703, 709, 450 N.E.2d 1199, 1204-05; see also *Stromquist v. Burlington Northern, Inc.* (3d Dist. 1983), 112 Ill. App. 3d 37, 45, 444 N.E.2d 1113, 1118-19.) However, in *Harris*, Justice Trapp, writing for this court, stated, "This writer would require the computational verdict forms in all [comparative negligence jury] cases for the reasons listed in the *Lawrence* opinion [(*Lawrence v. Florida East Coast Ry. Co.* (Fla. 1977), 346 So. 2d 1012)] of the Florida Supreme Court ***." (*Harris*, 115 Ill. App. 3d at 773, 451 N.E.2d at 268.) As noted in the appellate decision which the *Lawrence* court affirmed, the use of computational verdict forms permits a determination of whether comparative negligence is actually being applied. (*Florida East Coast Ry. Co. v. Lawrence* (Fla. App. 1976), 328 So. 2d 249, 253-54.) Also, computational verdict forms insure that comparative negligence achieves its desired goal of apportioning damages on the basis of fault. (*Florida East Coast Ry.*, 328 So. 2d at 255.) The use of such verdict forms allows for the correction of jury errors, forces detailed consideration of the case by the jury, and enables the trial court to avoid using long, complicated jury instructions which would invite reversible error. (*Florida East Coast Ry.*, 328 So. 2d at 255, citing Timmons & Silvis, *Pure Comparative Negligence in Florida: A New Adventure in the Common Law*, 28 U. Miami L. Rev. 737, 802 (1974).) In at least 13 States, the use of computational verdict forms is now required in all comparative negligence jury cases by either statute or judicial decision. See V. Schwartz, Comparative Negligence §17.4 (2d ed. 1986 & Supp. 1990).

The present case provides a perfect illustration of the desirability of requiring the use of computational verdict forms in all comparative negligence jury cases, and of having computational findings in comparative negligence cases which are tried in bench trials. The award of only $50,000 for decedent's hospital, medical, and funeral expenses, considered in view of the proved amount of these expenses ($182,334.49) may, as the trial court concluded, signify a reduction in damages to account for decedent's comparative fault. If this is so, it is questionable whether the $200,000 wrongful death award reflects a reduction in plaintiffs' wrongful death damages in the same percentage as does the award for hospital, medical, and funeral expenses. In other words, the jurors could have simply picked two figures for these

damage awards which they felt were somewhat lower than those which would have been appropriate if no comparative negligence were chargeable to plaintiffs. The jurors may not have first determined the plaintiffs' total damages for wrongful death and for hospital, medical, and funeral expenses, and then reduced each of these figures by a uniform percentage, as they would have had to do if they had been provided with a computational verdict form. On the other hand, the small amount of damages awarded for hospital, medical, and funeral expenses could simply reflect the jury's inadvertent omission of various elements of damages from the amount of this damages award.

The speculation which arises when computational forms are not used seriously impedes effective review of the jury's apportionment of comparative fault. For all of the above reasons, it would be better practice to provide computational verdict forms to the jury in all cases where comparative fault is an issue. Where, as in this case, counsel fail to tender proper computational verdict forms, the court should direct counsel to do so; if the court finds their product to be unsatisfactory, then it is the duty of the court *sua sponte* to provide the jury with such verdict forms. Further, in bench trials, we suggest that the trial court make the same findings on the record which are required by computational verdict forms. See *Lawrence*, 346 So. 2d at 1017.

In suggesting the use of computational verdict forms in all jury cases where comparative fault is an issue, we are mindful that it generally is not incumbent upon the trial court to give jury instructions on its own motion. (*Chicago Land Clearance Comm'n v. Darrow* (1957), 12 Ill. 2d 365, 375, 146 N.E.2d 1, 7.) The Illinois Supreme Court has, however, recognized that there may be exceptions to this rule where "special circumstances" exist. (*Chicago Land Clearance Comm'n*, 12 Ill. 2d at 375, 146 N.E.2d at 7.) The necessity of safeguarding the process of effective review of apportionment of fault is the type of "special circumstance" which justifies a departure from the principle that courts generally have no duty to instruct the jury in a manner not requested by any of the parties; this is likewise the basis of our suggestion that in bench trials comparable findings be made of record.

### B. *Jury's Apportionment of Comparative Fault*

■ Because a computational verdict form was not provided the jury in the present case, we must attempt to deduce from the record before us whether the jury's implicit apportionment of fault—on which the trial court premised its denial of plaintiffs' request for an *additur* for hospital, medical, and funeral expenses—is contrary to the mani-

fest weight of the evidence. As pointed out by counsel, the best indication in the record of the jury's apportionment of comparative fault is the award of only $50,000 for hospital, medical, and funeral expenses, when the proved and undisputed amount of damages for these items was $182,334.49. If the jury reduced the amount of these damages to account for decedent's comparative fault, it means that the jury found that 72.6% of the total negligence was attributable to decedent.

While the record supports a finding of *some* comparative fault on decedent's part, a finding that decedent was guilty of 72.6% comparative fault would be against the manifest weight of the evidence (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 339, 498 N.E.2d 1135, 1138) on the basis of the record before us. Decedent's negligence in failing to remove himself from a speeding vehicle was far outweighed by O'Neal's negligence in failing to operate the vehicle in a safe manner and by the township's negligence in failing to warn of the danger which the curve in the road posed to motorists. In *Junker*, the plaintiff, who was an adult, placed himself in a hunting blind which was within firing range of another occupied blind, and did not take sufficient precautions to avoid being hit by fire from the other blind. The supreme court nevertheless affirmed the trial court decision that the jury's assessment of 65% fault against the plaintiff was contrary to the manifest weight of the evidence in view of the negligence of the owner of the hunting park in which the accident occurred in arranging the blinds and in view of the negligence of the hunter who fired the pellet which struck plaintiff. In the present case, there was arguably less evidence of comparative negligence attributable to decedent than in *Junker*, and yet, the jury probably attributed an even greater percentage of the total fault to decedent.

Ordinarily, a holding that the jury's apportionment of fault is contrary to the manifest weight of the evidence requires a new trial as to the apportionment of fault issue. (See *Bofman v. Material Service Corp.* (1984), 125 Ill. App. 3d 1053, 1062, 466 N.E.2d 1064, 1070.) If the record establishes that the assessed damages are manifestly inadequate or that proved elements of damages were ignored, or if the damage assessments bear no rational relationship to plaintiff's losses, the issue of damages must also be adjudicated for a second time at the new trial. (See *Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6.) This brings us to the next issue raised by this appeal.

## V. NOTICE OF APPEAL

■ In this case, despite the general principles discussed above, we conclude that plaintiffs' notice of appeal precludes us from granting a new trial as to the comparative fault issue because plaintiffs did not request this relief. Further, the relationship between the degree of fault of each party and the amount of recoverable damages prohibits a new trial as to damages only or entry of an *additur* as to the hospital, medical, and funeral expenses.

Plaintiffs' notice of appeal states, in part, the following:

> "Plaintiffs-Appellants pray that the Appellate Court reverse said judgement [*sic*] and enter a judgement [*sic*] notwithstanding the verdict of the jury with respect to the issue of comparative fault of the Plaintiffs-Appellants [*sic*] decedent, CORY JOHNSON, order a new trial on the issue of damages only or, in the alternative, that this Court enter an additur with respect to the medical and funeral expenses in the amount of $132,334.49."

In *McCottrell v. Benson* (1961), 32 Ill. App. 2d 367, 178 N.E.2d 144, the defendant-appellant complained of an error in the admission of evidence. The appellate court held that the erroneous admission of the evidence ordinarily would have entitled defendant to a new trial. However, in his notice of appeal, defendant requested only outright reversal of the judgment entered against him. Defendant explicitly stated that he did not wish that the cause be remanded for further proceedings. Relying on (1) the release of errors doctrine (2 Ill. L. & Prac. *Appeal and Error* §71, at 168 (1953)), and (2) the principle that the right to a new trial may be abandoned by (a) failure to argue a motion for a new trial in the trial court (*Berg v. New York Central R.R. Co.* (1944), 323 Ill. App. 221, 223-24, 55 N.E.2d 394, 396, *aff'd* (1945), 391 Ill. 52, 62 N.E.2d 676), or (b) the failure of the trial court to rule on such a motion (*Fulford v. O'Connor* (1954), 3 Ill. 2d 490, 501-02, 121 N.E.2d 767, 773), the court held that an appellant who specifically states he does not want a cause remanded for a new trial circumscribes the relief which he seeks in the reviewing court. (*McCottrell*, 32 Ill. App. 2d at 370-71, 178 N.E.2d at 145-46.) Because the defendant-appellant was not entitled to outright reversal, the appellate court affirmed the judgment against him. *McCottrell*, 32 Ill. App. 2d at 373, 178 N.E.2d at 147.

Here, plaintiffs' counsel was asked at oral argument about the relief requested, and responded that plaintiffs did not want a new trial on the issue of the apportionment of fault as to all parties. We con-

clude that this brings the plaintiffs into the position of the appellant in *McCottrell*, and we will not grant relief not only not requested, but specifically disclaimed. In our judgment, the issue of apportionment of fault in this case is so intertwined with the issue of damages that a new trial on damages only cannot fairly be granted; nor would the other relief requested by plaintiffs be appropriate.

By providing that a notice of appeal shall "specify *** the relief sought from the reviewing court" (134 Ill. 2d R. 303(c)(2)), Supreme Court Rule 303 contemplates that a notice of appeal limit to some extent the relief which the reviewing court may grant. Although some decisions hold the prayer for relief portion of a notice of appeal does not limit the relief which may be granted by the reviewing court (*e.g., Illinois Bell Telephone Co. v. Purex Corp.* (1980), 90 Ill. App. 3d 690, 693, 413 N.E.2d 106, 108-09; *Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 850-51, 365 N.E.2d 390, 397), these decisions involved situations where the appellee argued that the appellant's prayer for relief prevented the reviewing court from granting the relief requested in the appellant's arguments on appeal. By contrast, we are here confronted with the question of whether a reviewing court may *sua sponte* grant a type of relief requested by neither the appellant nor the appellee. Respect for the rights of litigants to control the course of their litigation requires that we answer this question in the negative.

Because we do not order a new trial as to comparative fault, we cannot order a new trial as to damages in this case, even were we to hold that the damage awards are manifestly inadequate. In cases where comparative negligence is an issue, the proper amount of a damage award is a function of the percentage of fault attributable to the party in whose favor the damage award is entered. Although the total amount of plaintiff's damages remains the same, the amount of damages which the plaintiff may recover depends on the percentage of negligence attributable to the plaintiff. Where, as here, the assessment of comparative fault is contrary to the manifest weight of the evidence, but we are precluded from granting a new trial as to that issue, a new trial as to damages only, or the entry of an *additur* would not be appropriate. (*Cf.* 2 Comparative Negligence (MB) §15.20[3][b], at 15—35 (1991) (suggesting that if apportionment of negligence is part of damages issue, new trial limited to negligence apportionment *and* damages may be appropriate).) Therefore, we need not consider plaintiffs' contentions that the damages awarded on the survival and family expense counts are inadequate.

Because we are precluded from entering an *additur*, we also need not consider the township's argument that it is entitled to a set off against any *additur* which we may enter.

Affirmed.

KNECHT, J., concurs.

PRESIDING JUSTICE LUND, specially concurring:
I concur with Justice Steigmann's opinion. Hereafter, I will be inclined to reverse, based on the failure to give a computational verdict form when there is a comparative negligence issue.