ILLINOIS BELL TELEPHONE COMPANY, Plaintiff-Appellant, *v.* PUREX CORPORATION, LTD., Defendant-Appellee.

First District (3rd Division)    No. 79-943

Opinion filed November 12, 1980.

L. Bow Pritchett and Georgia J. Reithal, both of Chicago, for appellant.

Michael R. Kuzel and Philip McGuire, both of Galliani & Kuzel, Ltd., of Chicago, for appellee.

Miss PRESIDING JUSTICE McGILLICUDDY delivered the opinion of the court:

This action was brought by the Illinois Bell Telephone Company (Illinois Bell) to recover for property damage to its underground cables allegedly caused by the negligent acts of the defendant, Purex Corporation, Ltd. (Purex). After Illinois Bell presented its case, Purex rested without presenting evidence and moved for a directed verdict. The trial court directed a verdict in the defendant's favor. The plaintiff's post-trial motion was denied and the plaintiff appeals.

Three issues are presented for review: (1) whether the trial court erred in directing a verdict against Illinois Bell; (2) whether the trial court erred in ruling on certain evidentiary matters; (3) whether Illinois Bell should be granted a new trial on the question of causation only. In

addition, the defendant alleges that this court lacks jurisdiction because no appeal has been taken from a final judgment.

We first address the defendant's jurisdictional argument. The defendant contends that this court lacks jurisdiction to entertain this appeal because the plaintiff's notice of appeal does not purport to be from the final judgment entered on November 2, 1978, and because the relief sought by the plaintiff was not a reversal of that judgment.

The plaintiff's notice of appeal reads as follows:

> "Plaintiff, ILLINOIS BELL TELEPHONE COMPANY, an Illinois corporation, hereby appeals from the Order of the Circuit Court of Cook County, Illinois, dated March 19, 1979, denying plaintiff a new trial on the issue of proximate cause only, and further, denying the plaintiff a new trial on all the issues.
>
> Plaintiff * * * prays that the Appellate Court grant a new trial on the issue of proximate cause only and enter judgment in favor of ILLINOIS BELL on the issue of damages and the other issues of liability. Alternatively, the plaintiff prays that the Appellate Court grant a new trial on all issues, and to order such further relief with respect to trial errors as the Court deems appropriate."

The March 19, 1979, order of the Circuit Court of Cook County, referred to in the plaintiff's notice of appeal, was an order denying the plaintiff's post-trial motion for a new trial.

■■ ■ Appeals in civil cases, with certain exceptions not material here, may be had only from final judgments. (*English v. English* (1979), 72 Ill. App. 3d 736, 393 N.E.2d 18; Ill. Rev. Stat. 1977, ch. 110A, par. 301.) An order overruling a motion for a new trial is not a final appealable order. (*Robson v. Pennsylvania R.R. Co.* (1949), 337 Ill. App. 557, 86 N.E.2d 403.) Therefore, the defendant argues that the plaintiff did not appeal from a final judgment and this court therefore has no jurisdiction to hear this appeal.

We reject the defendant's argument. In *LeMenager v. Northwestern Barb Wire Co.* (1938), 296 Ill. App. 568, 16 N.E.2d 824, a case cited by the defendant, this court lacked jurisdiction because no final judgment order had been entered prior to the filing of the notice of appeal. *City of Palos Heights v. Village of Worth* (1975), 29 Ill. App. 3d 746, 331 N.E.2d 190, held that the appeal was properly brought from the final judgment order and the notice of appeal was not insufficient because it did not mention a subsequent order which denied the appellant's post-trial motion to vacate.

The defendant also cites *Robson v. Pennsylvania*, which actually is support for a determination by this court that we have jurisdiction of this appeal. In *Robson* a final judgment had been entered on June 3, 1948.

The plaintiff's subsequent motion for a new trial was denied on June 28, 1948. This denial included surplusage that directed that judgment be entered on the verdict. The plaintiff's notice of appeal recited that it was appealing from the judgment in favor of the defendant "made final by the order entered June 28, 1948, overruling the plaintiff's motion for a new trial." The defendant in that case argued that the June 28, 1948, order had the office only of overruling a motion for a new trial and thus was not a final appealable order. This court rejected the defendant's argument and held it was apparent that the plaintiff's appeal was from the judgment entered on June 3, 1948, which was the only judgment entered and not from the order denying his motion for a new trial.

■■ We agree with the *Robson* decision. While the plaintiff's notice of appeal in the instant case should have specified the final judgment entered on November 2, 1978, instead of the March 19, 1979, order denying the plaintiff's motion for a new trial, we will not dismiss this appeal because of an "error of form" since there was a final judgment in the case. *Luner v. Gelles* (1942), 314 Ill. App. 659, 42 N.E.2d 313.

■■ The defendant also argues that this court lacks jurisdiction to set aside the judgment entered November 2, 1978, because the only relief sought by the plaintiff in its notice of appeal was a new trial. Supreme Court Rule 303(c)(2) requires that a notice of appeal specify the judgment or part thereof appealed from and the relief sought. (Ill. Rev. Stat. 1977, ch. 110A, par. 303(c)(2).) The purpose of this requirement is to advise the successful party of the judgment complained of and the relief sought, and the absence of a strict or technical compliance with the form of the notice is not fatal. *(Mooring v. Village of Glen Ellyn* (1978), 57 Ill. App. 3d 329, 373 N.E.2d 35.) The failure to include a certain prayer for relief in the notice of appeal is merely an error in form and not an error of substance and the appellate court does not lose its jurisdiction by technical errors of this sort where an appellee is not otherwise prejudiced. *Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 365 N.E.2d 390.

■■ Applying these principles to the case at bar, we hold that the plaintiff's notice of appeal contained an error of form rather than of substance and that the defendant was not prejudiced thereby. The defendant was clearly informed that the plaintiff was seeking a new trial and, inferentially, a vacation of the prior judgment since a new trial could not be granted unless the final judgment is also set aside. Therefore, we reject the defendant's contentions that this appeal must be dismissed.

At trial Illinois Bell sought to prove that the defendant was negligent in permitting naphtha solvents and/or similar chemicals to escape its premises and to enter Illinois Bell's manhole and duct system. Illinois Bell argued that the seepage caused extensive damage to certain cables that eventually had to be replaced at an alleged cost of $32,964.05. The

damaged underground cables were located in a duct system that ran parallel to Elston Avenue along the east curb, just north of a manhole at 2241 North Elston Avenue. This manhole was adjacent to a yachting store and boat yard on the east side of Elston and was directly across the street from the Purex storage yard. A tannery and an ink manufacturing plant were located to the south of the boat yard.

A duct is a rectangular piece of concrete or plastic material, several feet long, with holes running through its length to allow for telephone cables to be pulled through. The ducts are laid in manholes which are not watertight. Seepage occurs through manhole covers and natural seepage of city water and sewage exists in the manholes. The telephone cables consist of copper conductors individually insulated and enclosed in aluminum or steel jackets. The seams of each metal jacket are soldered together, but pinholes remain in the seams through which water and other contaminants could penetrate to the conductors. The pinholes are sealed by an asphalt flooding compound. An exterior sheath of polyethylene is installed over the flooding compound. To further protect the cable wires against water and contaminants, the cables are pressurized.

In September 1972, a problem was reported in Illinois Bell's cables on Elston Avenue. Dennis Gonka, a cable splicer, in 1972, isolated the problem. He opened the manhole, found it full of water and noticed an odor similar in smell to turpentine or paint thinner. The water was coated with a white, tan or beige jellylike substance as were the cables and walls and floor of the manhole. Gonka testified at trial that, in his 10 years' experience as a cable splicer, he had on three or four occasions observed the effect of petroleum-base products on polyethylene jacketed cables. He stated the petroleum products did not directly damage the cables; rather, the polyethylene sheath became softened so that water could permeate and thereby damage the cables.

Thomas Lykowski, Illinois Bell's cable splicing foreman in 1972, testified that he too observed the tan, jellylike substance with a slight petroleum odor, on the cables, floor and walls of the manhole and ducts running parallel to Elston. The substance was also present in two ducts running south or west from the manhole to the driveway at the Purex loading area. These two ducts were not in use and had been sealed with concrete caps at both ends. Lykowski observed a similar jellylike substance in the Purex storage yard (inside the retaining wall), on its delivery driveway and along the sidewalk, curb and gutter. He did not see the substance flow from the Purex property to Illinois Bell's manhole and noted that the substance would have had to flow up the concave surface of the street to reach the manhole. Lykowski said the substance was not visibly present on the premises of any other business in the area.

Lykowski testified that the polyethylene sheath was removed from

the damaged cables during temporary repairs. The flooding compound underneath the sheath had been dissolved, and water had evidently gotten inside because there were rust spots at the seams of the steel surrounding the copper conductors.

Robert Siljestrom, claims representative for Illinois Bell assigned to investigate the loss, testified that he first visited the damaged area on September 22, 1972. He observed a jellylike substance and noticed a strong petroleum-type odor inside the manhole. He saw no evidence of petroleum-type products in the boat yard and office building directly east of the manhole or in the tannery business to the southeast of the manhole. Siljestrom testified that he observed a similar material in Purex's loading dock area, on the retaining wall and sidewalk, over the curb and partly onto the street and the sewer cover.

Siljestrom talked with Purex plant manager Ronald Fogler on September 22 and 26, 1972. On the latter date, Fogler took samples of the jellylike substance in the manhole for testing to determine whether the substance was Purex's chemical. Fogel denied Siljestrom permission to take samples from inside the Purex yard. On October 6, Fogel told Siljestrom that three underground tanks belonging to Purex were tested for leaks and the results were negative. Siljestrom was never given the results of the chemical analysis of the manhole samples taken by Fogel.

Siljestrom stated he had no training in chemistry and was not aware of any need for urgency in making tests of the samples of the jellylike substance. He said Illinois Bell initially did not undertake an independent chemical analysis of the samples taken from the manhole in September because of the cost and in reliance on Fogel's representation that he would have the samples tested. The September samples were not preserved. Cost also prohibited Illinois Bell from digging up the street and sidewalk in front of the Purex driveway to test the soil conditions.

During the period of September to November 1972 Illinois Bell had the street excavated to expose the duct run, pumped water out of the manhole on several occasions and completed temporary repairs on the cables. Siljestrom took two samples from the manhole on November 28, 1972: (1) a water solution at the bottom of the manhole and (2) a portion of the jellylike substance scraped from the manhole wall just below the unused two-duct run. The samples were delivered to McCrone and Associates for chemical analysis. In January 1973 Siljestrom sent McCrone and Associates samples of the damaged and undamaged cables.

Illinois Bell presented two expert witnesses, Richard Putscher, a chemist for McCrone and Associates, and Doctor Ralph Sabia, an Illinois Bell supervisor of organic materials. Putscher testified that he tested the samples submitted by Illinois Bell. The first sample submitted in Novem-

ber 1972 proved to be water. The second sample, the jellylike substance, contained water, chlorinated hydrocarbons, soap and a trace of undeterminable highly volatile hydrocarbons. He concluded that the chlorinated hydrocarbons and soap would not permeate or dissolve a polyethylene sheath, but was unable to draw such a conclusion with regard to the undeterminable hydrocarbons.

Putscher also tested the damaged Illinois Bell cable. He performed one test on the asphalt flooding compound under the polyethylene sheath. The asphalt sealer, a heavy hydrocarbon product, appeared normal although the test did not rule out the presence of other lighter hydrocarbons. During a second test, Putscher segregated a cross-section piece of the cable in a sealed jar overnight. He could not identify or isolate any particular odor but said the odor smelled like a volatile, bland hydrocarbon solvent that could present a permeation problem. Putscher then distilled a portion of the asphalt flooding compound. He discovered water and a volatile hydrocarbon similar to but not identical to VM & P naphtha (a substance used by Purex). Putscher testified that, based on his experience, the two materials discovered in the flooding compound, water and naphtha, should not have been present in the Illinois Bell cable. He further stated that naphtha readily evaporates and would permeate polyethylene sheaths and dissolve the asphalt flooding compounds.

Doctor Ralph Sabia, Illinois Bell's second expert witness, discussed the makeup of the company's underground cables and described the protective devices used to prevent and retard exposure of the copper conductor wires to water and other contaminants. He also testified that polyethylene will absorb a naphtha solvent, become soft, and allow water permeation. Naphtha solvents will also soften the flooding compound in the telephone cables and, in sufficient quantities, will turn the compound into a liquid leaving the pinholes in the metal jacket underneath the asphalt compound unprotected. Gas could then escape through the pinholes causing the polyethylene jacket to balloon out. If water is present in the manhole, it would corrode the metal jacket protecting the copper wires.

In response to a hypothetical question, Doctor Sabia stated that the absence of naphtha from the jellylike substance taken from the manhole which had been opened for approximately a week did not rule out the possible presence of naphtha in the substance at one time because naphtha, being a highly volatile hydrocarbon, could have evaporated.

Thomas Barker, vice president of Drake Petroleum Company, was subpoenaed by Illinois Bell to produce records of sales to Purex during 1972. Five products, including Drake VM & P naphtha, were delivered practically every week to Purex. The plaintiff also introduced evidence that the tannery and ink companies, located to the south and east of the

manhole, used naphtha products but that the tannery fed its naphtha wastes into pipes leading into the Metropolitan Sanitary District sewage system and the ink company stopped manufacturing ink in July 1971.

At the close of the plaintiff's case the trial judge granted the defendant's motion for a directed verdict. While the record does not disclose the reason for the court's decision, we believe the absence of sufficient proof by the plaintiff of causation was a proper basis upon which to grant the defendant's motion for a directed verdict.

In a negligence action, it is ordinarily the function of the jury to determine whether the defendant's actions were the proximate cause of the plaintiff's damages. (See, *e.g., Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74; *Ortiz v. City of Chicago* (1979), 79 Ill. App. 3d 902, 398 N.E.2d 1007.) However, the trial court has the power to direct a verdict when all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Lode v. Mercanio* (1979), 77 Ill. App. 3d 150, 395 N.E.2d 1014.

■■ In the case at bar the plaintiff argues that sufficient circumstantial evidence was produced to support the allegation that there was a causal relationship between the use of a naphtha product (VM & P naphtha) by Purex and the naphtha found in the damaged Illinois Bell manhole and cables. While the use of circumstantial evidence is permissible to prove proximate cause, the circumstantial evidence must reasonably permit the inference of cause and effect. (*Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 336 N.E.2d 528.) It is not required that the circumstantial evidence both create a reasonable inference of the fact to be shown and also exclude all other possible inferences (*Scholle v. Continental National American Group* (1976), 44 Ill. App. 3d 716, 358 N.E.2d 893 (supp. opinion)); but liability cannot be based on speculation, mere conjecture or surmise (*Publication Corp. v. Chicago River & Indiana R.R. Co.* (1977), 49 Ill. App. 3d 508, 364 N.E.2d 523). Speculation is not a proper substitute for proof. (*Hawkins v. Richardson* (1975), 29 Ill. App. 3d 597, 331 N.E.2d 201.) Proximate cause can only be established when there is a reasonable certainty that defendant's acts caused the injury or damage. See *Potter v. Edgar* (1975), 34 Ill. App. 3d 33, 339 N.E.2d 321.

A review of the plaintiff's evidence shows that the plaintiff's chain of circumstantial proof relative to proximate cause contained substantial missing links that would have required speculation and conjecture by the jury. The evidence most favorable to the plaintiff was that a light colored, jellylike substance was found in the manhole where the damaged cables were located. A substance similar in appearance and odor was found in Purex's storage yard, retaining wall, driveway and curb. Neither sub-

stance was tested when the investigation was initiated. When samples of the substance and a water solution were taken from the manhole two months later, tests showed that naphtha was not present in either sample. Two months later, four months after the damage to Illinois Bell's cables was discovered, a portion of a damaged cable was tested and chemically analyzed. The asphalt flooding compound inside the cable, underneath the polyethylene sheath, was shown to contain a naphtha solvent that was similar to but not identical with the VM & P naphtha used by the defendant.

Expert testimony showed that naphtha possessed characteristics of being highly volatile and readily evaporative. It has the ability to permeate polyethylene and soften and dissolve asphalt flooding compounds. Without the asphalt protection, the metal jacket in the telephone cable surrounding the copper conductors would corrode when exposed to water.

The plaintiff contends that one could reasonably infer that the naphtha-like contaminant found in the cable was present at one time in the jellylike substance found in the manhole but that it had evaporated between the time of damage and the time of testing. We cannot agree. This inference is too speculative and unreasonable based on the evidence presented.

While the plaintiff is correct that proof of the presence of naphtha in the damaged cable was a link in its chain of circumstantial evidence, the plaintiff fails to realize that its chain is missing other evidentiary links. Plaintiff has not shown a connection between Purex and the naphtha found in its cable. It could not establish with any degree of probability that naphtha was indeed present in the jellylike substance found in its manhole. The plaintiff would have a jury assume that naphtha was present in the substance found in the manhole but that it had evaporated during the two-month period of time when the manhole was opened and when the first chemical analysis of the substance was performed. This posture is untenable when, based on the expert testimony of the plaintiff's own witness, this fact could have been established with a greater degree of probability if a sample of the ground underneath the cable had been tested. Doctor Sabia testified that while naphtha does evaporate, in liquid form it should have permeated and saturated the ground in the manhole. The plaintiff did not test a sample of the ground which, according to Doctor Sabia, would have shown the presence of naphtha if it had been present in the manhole.

Furthermore, assuming that naphtha was present at one time in the jellylike substance in the plaintiff's manhole, the plaintiff has not proven how the defendant was responsible for its presence. The plaintiff did not present expert testimony showing that the substance in its manhole was

identical to the jellylike substance on Purex's property. The only testimony in this regard was that presented by the plaintiff's two lay witnesses who said the two substances looked and smelled similar. While the defendant used VM & P naphtha, there was no showing that the substance on Purex's property contained naphtha.

Finally, even assuming that the Purex substance did contain naphtha and that it was identical to the substance in Illinois Bell's manhole that assumingly contained naphtha, the plaintiff has failed to establish with any degree of probability how the Purex substance got into the manhole. The plaintiff argues that the contaminant could have entered the manhole through seepage into the duct run or through the top of the manhole. The plaintiff relies on testimony that the jellylike substance in its manhole was present in and around an unused and sealed two-duct system that ran underground from the main duct run and terminated in the direction of the Purex yard. Alternatively, the plaintiff relies on evidence that the jellylike substance flowed on top of the ground from Purex's loading dock area into the sewer system. Based on all of the evidence, the jury, in order to find the defendant liable, would have to guess which one of the two possibilities occurred.

■■ The plaintiff's chain of causation, based on circumstantial evidence, would require substantial impermissible speculation and conjecture by the jury. Since no factual proof of causation existed, all of the evidence when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favored the defendant that no contrary verdict could ever stand. (*Pedrick.*) Therefore, the trial court properly granted Purex's motion for directed verdict.

As the plaintiff is not entitled to a new trial, we need not discuss the remaining issues presented for review.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

SIMON and RIZZI, JJ., concur.