SK HAND TOOL CORPORATION *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. DRESSER INDUSTRIES, INC., Defendant-Appellant and Cross-Appellee.

First District (1st Division)   No. 1—94—3997

Opinion filed October 15, 1996.

418

BUCKLEY, J., dissenting.

Bartlit, Beck, Herman, Palenchar & Scott, of Chicago (Philip S. Beck, Peter B. Bensinger, Jr., and Ellen A. Cirangle, of counsel), for appellant.

Pavalon & Gifford, of Chicago (Frederick F. Grace, Jr., of counsel), for appellees.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs SK Hand Tool Corporation (SK) and Corcoran Partners Limited (Partners) sued defendant Dresser Industries, Inc. (Dresser), for fraud in connection with the Partners' purchase of Dresser's hand tool division. Following a trial in the circuit court of Cook County, the jury returned a verdict for plaintiffs in the amount of $4 million in compensatory damages and $50 million in punitive damages. The trial court denied Dresser's post-trial motion, but granted a remittitur totalling $42 million of the punitive damages. Plaintiffs consented to the remittitur. Both sides now appeal.

The record on appeal indicates that Daniel Czuba and Thomas Corcoran formed the Partners in 1982 to acquire and turn around troubled companies. The Partners first sought to buy Dresser's hand tool division.

Dresser chief executive officer Jack Murphy wanted the sale to close before the end of the fiscal year on October 31, 1983. The parties signed a letter of intent on August 16, 1983, and began negotiating a definitive agreement. Murphy would not sell to the Partners on credit. According to Rex Sebastian, a former senior vice-president of Dresser, Murphy also wanted to ensure that the loss to Dresser would not exceed $1 million.

The sale was closed by a purchase agreement (Agreement) signed on October 26, 1983. The purchase was a leveraged buy-out wherein the Partners put up $100,000 cash, pledged their personal assets and borrowed approximately $7.8 million to purchase the business. The estimated sale price was discounted by $10 million from book value, reflecting the poor performance and contingent liabilities of the business. The Partners' interest was assigned to SK, a wholly owned subsidiary of the Partners.

Paragraph 3.2 of the Agreement provided that Dresser warranted an "Effective Date Balance Sheet," prepared from the books of account of the hand tool division in accordance with the accounting principles, practices and procedures consistently applied by Dresser with respect to the hand tool division. The effective date balance sheet was to fairly present in all material respects the asset values and liabilities for the items reflected thereon as of the effective date.

Paragraph 2.4 of the Agreement provided that Dresser would have 45 days from the closing date to submit the effective date balance sheet to the buyer. Paragraph 2.4 also provided that in the

event of any disagreement with the balance sheet within 60 days after receipt thereof, the parties would make a good-faith attempt to resolve their differences, with any such resolution becoming final and binding. If the parties were unable to resolve their differences within 30 days of Dresser's receipt of notice from the buyer, the parties would appoint a nationally recognized accounting firm to arbitrate the dispute.

In December 1983, Dresser submitted the effective date balance sheet, showing that SK owed an additional $28,000 for the purchase of the hand tool division. SK submitted the effective date balance sheet to the accounting firm of Peat, Marwick & Mitchell, which itemized $3.5 million in possible offsets SK might have against Dresser's calculation of the purchase price. SK submitted the list to Dresser, which disputed some of the claimed offsets. In March 1984, the parties unsuccessfully tried to settle their differences. Peat, Marwick & Mitchell later revised its list to $2.5 million in possible offsets. However, disagreements between the parties remained.

On April 25, 1984, the plaintiffs filed a complaint to compel arbitration in the circuit court of Cook County. Dresser filed a petition for removal in the United States District Court for the Northern District of Illinois. Dresser also filed a three-count countercomplaint for sums Dresser allegedly advanced to SK to meet certain payroll obligations after the purchase. The plaintiffs later added counts alleging common law fraud and violation of the federal racketeering statutes to its complaint in federal court. On December 17, 1984, the district court ordered Dresser to submit the claims relating to the calculation of the effective date balance sheet to arbitration; Dresser's counterclaims were not submitted for arbitration.

On July 25, 1985, the arbitrator awarded the Partners/SK a $1,386,000 reduction in the purchase price. In late 1985, SK was sold to a French entity named Facom. Corcoran and Czuba each made over $2 million on the sale.

On January 29, 1987, the racketeering count was dismissed. On July 29, 1987, the federal district court granted judgment on the arbitration award to the Partners/SK and to Dresser on all three counts of its countercomplaint. On August 19, 1987, SK and Dresser executed releases in satisfaction of judgment in the amount of $1,357,848.18 and interest and $1,456,121.83 and interest, respectively. In sum, the Partners/SK owed Dresser approximately $98,000. The trial court granted Dresser's motion to dismiss the common law fraud claim for lack of jurisdiction.

Plaintiffs then filed a complaint against Dresser in the circuit court of Cook County on January 27, 1988. The complaint, later

amended, alleged that officers and agents of Dresser misrepresented the value of the hand tool division's assets and liabilities. In particular, the plaintiffs claimed that William Downey, president of the Dresser Tool Group, told them that the dollar value of "lifts"[1] to which the hand tool division was committed was "practically nothing." Plaintiffs also alleged that Dresser Tool Group comptroller John Macaulay falsely told them that the hand tool division's accounting practices differed from generally accepted accounting principles (GAAP) only with respect to intracompany transfers. Plaintiffs also alleged that Macaulay falsely represented that Dresser's figure for obsolete inventory would be "proper," when Dresser had removed items from the list of obsolete inventory that allegedly should have been included. The complaint further alleged that George Fansmith, the comptroller for the hand tool division, represented that a liability for cooperative advertising had been accrued, but the liability was allegedly not reflected in Dresser's balance sheets, thereby inflating the purchase price. Finally, the complaint alleged that Dresser's representation that the balance sheet would fairly present the asset values and liabilities for the items reflected thereon was false.

Plaintiffs alleged that they relied on these statements but, after learning of their falsity, were forced to curtail marketing expenditures, resulting in lost sales and profits and a lower resale price.

At trial, Daniel Czuba testified that after the Partners signed the letter of intent, he and Corcoran and outside advisors investigated the business. Czuba testified that in late August 1983, he discussed the hand tool division's income statement and the balance sheet with comptroller Fansmith. Czuba testified that he asked Fansmith what was included in the accrued liabilities and that Fansmith replied "just the ordinary things, coop and taxes and all sorts of things that you would expect to find in an accrual account." Czuba asked whether there was anything abnormal in the way Dresser kept the books; Fansmith replied that they "just use conventional accounting." Czuba testified that he then thought he understood how Dresser would have accounted for lifts.

---

[1]The term "lifts" refers to a marketing practice used to gain new customers and increase sales flow in the hand tool industry. A hand tool company wishing to sell to a customer that uses a competitor's hand tools will agree to take delivery of, "lift," the old (competing) hand tools and issue a credit that can be applied against the sale of the new hand tools. The hand tool company will then resell the old hand tools, generally below market prices. The plaintiffs alleged that the hand tool division had approximately $1.3 million of lift obligations that Dresser failed to include in its balance sheets.

Czuba also testified that he later made several requests to Fansmith for a breakdown of other accrued liabilities, but was told that a complete breakdown could not be supplied. Czuba testified that he did not recall ever asking anybody "flat-out" whether they made accruals for lift expenditures.

Czuba testified about other efforts to determine the amount of lifts that were authorized but had not "come home to roost." Czuba stated that he asked Russ Kennedy, the vice-president of marketing for the division, about lifts. Kennedy said that he did not know and told Czuba to see Bill Downey, president of the Dresser Tool Group, as the final authority on lifts.

Czuba testified that in mid-September of 1983, he and Corcoran asked Downey how many dollars of lifts were in process or in transit or outstanding. Downey replied "at that point practically nothing, less than $200,000, and it doesn't matter anyway because they'll all be flushed through prior to September 30th." Corcoran testified that he and Czuba asked Downey about the status of "lifts in transit" and were told that they would be flushed through by September 30.

Downey testified that he told Corcoran and Czuba that as of the end of July—the last time he had approved lifts—the amount was near $1 million. However, Downey testified that he did not believe that it was correct to say that there was over $1 million of lifts in transit.

Downey testified that he did not tell Corcoran and Czuba how the division accounted for lifts; rather, he told them that if they wanted the specific exposure, they should ask the hand tool division. Downey admitted that at the time he spoke to Corcoran and Czuba, he knew that the lift exposure was not reflected in the financial statement. Downey also admitted that he knew that lifts might not be expensed for more than two months after the account receivable was booked.

Czuba testified that he had requested a list of excess and obsolete inventory—items that are discontinued or faulty in some way. Czuba testified that his request was referred to Macaulay, who reviewed a list that had been prepared, but decided not to provide a copy to the plaintiffs. Macaulay stated that a list would be prepared consistent with Dresser's policies, that he did not want to haggle over "nits and gnats," and that the plaintiffs would have a chance to go over it after the deal closed, make complaints and get adjustments, if needed.

Czuba later testified that Macaulay prepared a list of the inventory, categorizing it as excess, surplus and so on. Czuba testified that Macaulay later departed from Dresser's policies for categorizing inventory by adding several obsolete items to the list of good inventory. One example involved a "pawl," which is part of a ratchet. Ac-

cording to Czuba, the pawl had been made of metal which lasted 20 years, but had been changed to being made out of compressed metal powder, which lasted only two years on average. Before the Partners purchased the business, the hand tool division discovered the problem and returned to the metal pawls. Czuba stated that the Partners were charged approximately $35,000 for the compressed metal powder pawls.

On October 4, 1983, Corcoran and Czuba met with Downey, Macaulay, and former hand tool division president John Reynertson. The parties, accompanied by counsel, discussed Dresser's representations and warranties regarding its financial statements. The Partners had asked Dresser to represent that the financial statements were prepared in accordance with generally accepted accounting principles (GAAP). Macaulay made a flat statement that the division statements do not conform with GAAP. Czuba asked him in what way they did not conform. Macaulay said "well, for example, in the way we account for intercompany transactions." Czuba asked if there were other examples. According to Czuba, Macaulay replied "none that I can think of right now." The Partners proposed a representation that the statements were prepared in conformance with GAAP except for intercompany transactions. Dresser rejected that proposal. Nevertheless, Corcoran testified that he believed that Dresser's intercompany transfers were the only deviation from GAAP.

Thomas Hunter, one of Dresser's counsel at the meeting, testified that he had said that he did not believe anyone at Dresser knew whether the hand tool division's accounting practices complied with GAAP. Macaulay testified that he was not sure whether he knew how the hand tool division accounted for lifts on October 4, 1983. Downey later testified that Macaulay did know but could not say how long Macaulay had known.

According to Czuba, the parties ultimately agreed on the language quoted above as paragraph 3.2 of the Agreement.

The plaintiffs presented two expert witnesses on the issue of damages. James Moran, a certified public accountant, presented his calculation of the incremental sales and profits SK would have made if it had spent more money on the lift program in fiscal year 1984. Moran began with the plaintiffs' projected marketing capacity expense, then subtracted the amount actually spent on marketing (after adjusting for various expenses), resulting in a shortfall of lift removal expenses totalling $1,622,000. Moran further adjusted the number to account for commissions and other miscellaneous expenses, resulting in a total shortfall of $1,938,483.

Moran then assumed that the lift program would have begun in

March 1984 and averaged the shortfall over the seven months remaining in fiscal year 1984, resulting in a monthly deficit of $276,926. Moran then used a computer model to identify how this amount would apply to wholesale and retail sales. Moran also determined that promotional sales were 25% of ongoing sales. Moran used these bases to conclude that plaintiffs lost total gross incremental sales exceeding $4 million in 1985.

Moran then subtracted estimated related expenses, such as returns, discounts, and freight and volume rebates, along with other variable expenses such as commissions, display and installation costs, and interest expenses. Moran arrived at a net incremental profit for fiscal year 1985 of $1,196,000.

Chartered financial analyst John Borsch testified that he tried to determine what SK would have been worth when it was sold to Facom if it had experienced the incremental sales and profits calculated by Moran. Borsch used two approaches, both of which compared SK to the Snap-On Tool Corporation (Snap-On), which Borsch opined was the public company most similar to SK.

Borsch multiplied the approximately $4.1 million in incremental sales (posited by Moran) by a ratio of 1.38 (Snap-On's ratio of total revenue to market value), then reduced that figure by 30% to account for the illiquidity of SK's stock (which is not publicly traded). These calculations produced a figure of approximately $4 million. Borsch performed similar calculations using the estimated incremental profits, resulting in a figure of approximately $6.4 million. Thus, Borsch opined that plaintiffs could have made from $4 million to $6.4 million more from the sale of SK than what they were paid.

On cross-examination, Borsch admitted that Snap-On has independent salesmen who deliver tools directly to the mechanic's workplace, whereas SK sells to warehouse distributors. Borsch did not know whether Snap-On did lifts. Borsch also stated that Snap-On was the industry leader, a well-run, profitable company.

Dresser presented two expert witnesses, James Roth and James Cerone, who presented testimony critical of the data and the methodologies of Mr. Moran and Mr. Borsch.

Following closing argument, jury instructions and deliberations, the jury returned a verdict for plaintiffs, awarding $4 million in compensatory damages and $50 million in punitive damages. The trial court denied Dresser's post-trial motion, but granted a remittitur of $42 million of the punitive damages. The plaintiffs unsuccessfully sought clarification of the scope of the new trial that would be granted absent their consent. Plaintiffs consented to the remittitur; judgment was entered on November 1, 1994.

## I

On appeal, Dresser maintains that it was entitled to a judgment notwithstanding the verdict or a new trial on both liability and damages. A motion for a judgment notwithstanding the verdict should be entered only when all of the evidence, as viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 511, 229 N.E.2d 504, 513-14 (1967). In contrast, the decision to grant or deny a motion for new trial rests within the discretion of the trial court, but may be reversed when the verdict is against the manifest weight of the evidence. See *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973 (1990).

## II

■ Dresser maintains that it is entitled to relief because its officials and employees made no false statements. Dresser first claims that there was no false statement as to the amount of lifts in transit, arguing that there was merely a semantic misunderstanding that "lifts in transit" were the same as "outstanding lifts." Czuba's testimony, however, supports the conclusion that he asked Downey about outstanding lifts.

Dresser next contends that there were no false statements regarding how it accounted for lifts. Dresser points to Czuba's testimony that he never directly asked Dresser employees how Dresser accounted for lifts. However, the record shows that Czuba asked which items were included in the hand tool division's accrued liabilities and was told "just the ordinary things, coop and taxes and all sorts of things that you would expect to find in an accrual account." A jury could infer from the testimony that the credits for the approximately $1.4 million in outstanding lifts were not the sorts of things one would expect to find in an accrual account.

Dresser contends that there were no false statements with respect to whether its accounting complied with GAAP. However, the trial court did not rely on an affirmative misstatement regarding GAAP in denying Dresser's post-trial motion. The trial court's written decision states only that "Dresser's agents knew that their usual deviations from [GAAP] would cover the scheme."

In addition, Dresser does not address the alleged misrepresentations regarding obsolete inventory. In sum, Dresser has not shown that it is entitled to relief on the issue of liability, given the record on appeal.

## III

■ Dresser next argues that relief should have been granted

because the damages were based on a speculative calculation of lost profits. Plaintiffs initially respond that Dresser has waived this argument because Dresser failed to object to the introduction of the expert testimony or to the jury instructions on damages. Plaintiffs, however, failed to raise this argument in their initial brief, thereby resulting in waiver on appeal.

■ Plaintiffs also respond that Dresser confuses operating profits with gain on the resale of the business. However, the record clearly shows that plaintiffs' theory was that they would have made a larger gain on the resale of the business *if SK had not lost incremental sales and profits.* Thus, lost profits are at issue in this case. Moreover, Illinois courts have long rejected the use of speculative, inaccurate or false projections of income in the valuation of a business. *People v. Stevens*, 358 Ill. 391, 406, 193 N.E. 154, 160 (1934); *Reynolds v. Coleman*, 173 Ill. App. 3d 585, 596, 527 N.E.2d 897, 904-05 (1988). Thus, this court turns to address Dresser's argument.

Dresser claims that the award is inherently speculative because the hand tool business had a history of unprofitability. While there are Illinois cases involving profits lost due to the interruption of a business, there does not appear to be any case addressing unprofitable businesses.[2] Accordingly, it may be helpful to examine the standards for reviewing an award of lost profits damages in Illinois.

■ Generally, the question of damages is one of fact; courts are reluctant to interfere with the discretion of the jury in its assessment of damages. *Usselmann v. Jansen*, 257 Ill. App. 3d 978, 981, 629 N.E.2d 193, 195 (1994). This court, however, will depart from the general rule in a number of situations. See *Usselmann*, 257 Ill. App. 3d at 981, 629 N.E.2d at 195; *Perry v. Storzbach*, 206 Ill. App. 3d 1065, 1069, 565 N.E.2d 211, 214 (1990).

In particular, reviewing courts will reverse damage awards that are based on speculation or conjecture. *E.g., Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 515 N.E.2d 61 (1987). Although the amount of an award of lost profits need not be proven with absolute certainty, the plaintiff bears the burden of proving such damages with reasonable certainty. *Midland Hotel Corp.*, 118 Ill. 2d at 316, 515 N.E.2d at 66. Illinois courts have not hesitated to

---

[2]Although plaintiffs assert that SK "was consistently profitable both before and after" Dresser managed it, the exhibits that plaintiffs cite simply do not support the claim of profitability. The only references to profits that can be found therein refer to maintaining profitability for SK's wholesale customers. The record contains the testimony of defense expert John Cerone to the effect that SK experienced increasing operating losses while owned by the Partners.

reverse damage awards based on false assumptions or data as speculative. See, *e.g.*, *Midland Hotel Corp.*, 118 Ill. 2d at 317-18, 515 N.E.2d at 67; *Reynolds*, 173 Ill. App. 3d at 596, 527 N.E.2d at 904-05; *F.L. Walz, Inc. v. Hobart Corp.*, 157 Ill. App. 3d 334, 340-41, 510 N.E.2d 1248, 1252-53 (1987). As lost profits are frequently the result of several intersecting causes, the plaintiff must show with reasonable certainty that the defendant's conduct caused a specific portion of the lost profits. *Midland Hotel Corp.*, 118 Ill. 2d at 316, 515 N.E.2d at 66. Illinois courts will hold that an expert's opinion is based on speculation or conjecture when the expert fails to account for its party's actions or other significant factors. *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 909, 658 N.E.2d 1318, 1324 (1995) (and cases cited therein). A speculative award may be considered erroneous as a matter of law. See, *e.g.*, *Lewis v. Loyola University*, 149 Ill. App. 3d 88, 90, 500 N.E.2d 47, 48 (1986).

■ Evidence of prior profits is not the *sine qua non* of proof of damages suffered by a business in all cases. See *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 147, 281 N.E.2d 323, 325 (1972). Nevertheless, Illinois courts have long held as a general rule that while profits lost due to business interruption or tortious interference with a contract may be recovered, the business must have been established before the interruption so that the evidence of lost profits is not speculative. *E.g.*, *Green v. Williams*, 45 Ill. 206, 209 (1867); *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174, 491 N.E.2d 912, 917 (1986). The reason for the rule is that a new business has yet to show what its profits actually are. *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177, 191, 603 N.E.2d 1226, 1236 (1992). However, there are exceptions to the general rule. See *Milex Products, Inc.*, 237 Ill. App. 3d at 192-93, 603 N.E.2d at 1236-37 (and cases cited therein).

■ The logic of these cases persuades this court that a business that has not been profitable generally will be unable to provide competent proof by which the profits can be estimated with reasonable certainty. However, as in *Milex*, there may be cases in which such proof is adduced at trial. Thus, the question remains whether this case falls within the scope of the general rule or whether it is an exception.

The *Milex* case cited three exceptions in which an award of lost profits was upheld. *Milex Products, Inc.*, 237 Ill. App. 3d at 192, 603 N.E.2d at 1236, citing *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 542 N.E.2d 768 (1989); *Rhodes v. Sigler*, 44 Ill. App. 3d 375, 357 N.E.2d 846 (1976); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986). However, as the *Malatesta* court noted, these cases hold that evi-

dence of the profits of a person other than plaintiff, who operated the same established business at the identical location for the period of time for which plaintiff seeks damages, is not of such a speculative nature to require a finding that plaintiff's lost profits may not be proved to a reasonable certainty. *Malatesta*, 186 Ill. App. 3d at 621-22, 542 N.E.2d at 782. In sum, the cases cited in *Milex* involve awards based on actual profits made by established, profitable businesses. They are all quite distinguishable from this case, which involves an award based on the hypothetical profits of an established, unprofitable business.

The case that most strongly supports the damage award in this case is *Milex* itself. In *Milex*, the plaintiff recovered lost profit damages for a breach of a contract to manufacture a pharmaceutical product it had not previously marketed, based on expert economic analysis.

Like the *Malatesta* line of cases, *Milex* is factually distinguishable from this case. In *Milex*, the defendant never disputed that Milex would have marketed the product and would have made sales. The expert calculations in this case assumed that the entire shortfall in marketing expenses would have been applied to SK's planned lift program. The record, however, shows this assumption was not supported by the evidence.

For example, Mr. Roth testified regarding SK's September 1984 operating letter, in which the shortfall is attributed to the usage of a "board program" in lieu of lifts. The jury was also read the deposition testimony of Arlen Issette, an SK employee, who explained that the board program was an alternative to the lift program. Mr. Issette testified that lifts were suspended during the implementation of the board program, thereby corroborating SK's September 1984 records. Mr. Moran testified that he had not considered the information from the September 1984 operations letter, which also summarized SK's lift expenses.

Indeed, Moran testified that he never saw any document reflecting the lift program expenses as a line item, despite earlier testimony that he wanted SK's operations letters as a source of data for his analysis. Moran also testified that the plaintiffs gave him "various figures" for the amount of the lift program and testified that it "could have been" $1.6 million or "might even have been" $2.5 million. Such testimony does not provide an assurance of reasonable certainty, particularly where the September 1984 operations letter and expert testimony thereon shows a planned expenditure of $1.2 million and an actual expenditure of $463,000, resulting in a $737,000 shortfall. Cf. *Illinois Bell Telephone Co. v. Purex Corp.*, 90 Ill. App. 3d

690, 698, 413 N.E.2d 106, 112 (1980) (expert assumption is untenable where the record shows the assumed fact easily could have been established with a greater degree of probability). Moran simply applied the entire $1.6 million shortfall in marketing expense capacity to the lift program without a clear idea of the amount SK had planned to spend on that program. Moreover, Moran apparently had no idea of how much SK actually spent on the lift program, a fact necessary to calculating the amount, if any, of the shortfall in planned lift program expenses.

Moreover, as Moran did not account for the board program, he gave no testimony as to whether spending on the board program would have yielded comparable incremental sales or profits. Corcoran testified that, in the early stages of the board program, the plaintiffs believed that the board program was a good marketing alternative to the lift program, but later found out that it was not.

In sum, the record sets this case apart from *Milex*. Even assuming *arguendo* that Moran was a credible witness, the premise that the entire marketing shortfall would have been spent on the lift program is speculative at best, based on the record on appeal. The expert testimony failed to isolate the amount of lost profit, if any, caused by Dresser, failed to account for plaintiffs' own actions and failed to show that the analysis was based on a true premise, as required by *Midland Hotel* and *Damron*. The damages are speculative and cannot stand.

## IV

■ Given that it is unclear whether plaintiffs can establish these damages with reasonable certainty, the award of punitive damages must also be reversed. See, *e.g.*, *Kemner v. Monsanto Co.*, 217 Ill. App. 3d 188, 199, 576 N.E.2d 1146, 1153 (1991). Thus, as in *Midland Hotel*, *F.L. Walz,* and *Reynolds,* we conclude that the award must be reversed and the case remanded for a new trial on the issue of damages only.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

THEIS, J., concurs.

JUSTICE BUCKLEY dissents:
What we review here is an impeccable trial record. Prior to the

verdict, defendant never raised any legal question regarding plaintiffs' request for compensatory and punitive damages, and to this day, defendant raises no questions surrounding the conduct of the trial, the admission of evidence, the law under which the case was tried, or the jury instructions.

The majority finds that plaintiffs' evidence of damages was speculative. However, I believe the size of the award is the motive behind the majority's opinion, and I do not believe the sheer size of a jury award is a proper basis for such a finding. When one considers defendant's egregious conduct proved by plaintiffs, the risks plaintiffs took in their endeavor, and the size of defendant, the award is put into perspective. There is no question defendant's fraud caused plaintiffs some amount of compensatory damage, and I believe plaintiffs proved this amount of damage to a sufficient degree of certainty. Further, I do not believe the remittitur of the circuit court had any basis in law. I would affirm the jury verdict of $4 million in compensatory damages and $50 million in punitive damages for the following reasons.

The evidence put forth by plaintiffs proved their damages with reasonable certainty. Plaintiffs made $4 million in spite of defendant's fraud. Because of the financial chaos created by defendant's misrepresentation, plaintiffs spent $1.6 million less on marketing than their business plan had contemplated and was agreed upon by their lender. It is irrational to suppose that plaintiffs would have spent the missing $1.6 million unproductively. It is more logical to accept as true their testimony, undisputed at trial, that they would have spent the $1.6 million on lifts or something even more productive. Both the jury and the trial judge accepted this as true, and it is not this court's place to reject that finding.

The majority mistakenly relies exclusively on Roth's direct testimony, which gives the impression that Moran ignored the events that occurred after plaintiffs discovered defendant's fraud. However, these criticisms of Moran's statement miss the mark. These undisputed events, supposedly ignored by Moran, had already been taken into account in the underlying SK financial statements on which Moran's statement was based.

Borsch took Moran's incremental sales and profits, compared them to Snap-On, made a large deduction for liquidity (30%), and arrived at two incremental values: $6.4 million, which the jury rejected, and $4 million based on sales, which the jury accepted. Defendant's attack was primarily directed at this testimony.

Defendant's criticism of Borsch's valuations parrots the testimony of Mr. Cerone, defendant's financial analyst. Cerone testified that

Snap-On is a publicly traded industry leader and SK is not. However, Borsch allowed for this difference by discounting his valuation by 30%. The bottom line is that neither the jury, nor the trial judge, who were in the best position to weigh Cerone's testimony against Borsch's, chose to deny compensatory damages based on Cerone's testimony. Yet, now the majority reweighs Cerone's testimony and finds it to outweigh Borsch's. The weight to be assigned expert testimony is for the jury, who actually heard it, not appellate judges who have only had it described to them by counsel for the verdict loser. *Treadwell v. Downey*, 209 Ill. App. 3d 999, 1003, 568 N.E.2d 998, 1001 (1991).

Aside from the fact that plaintiffs did prove their amount of damages sufficiently, what I find even more disturbing about the majority opinion is that it summarily dismisses the fact that defendant failed to object to the introduction of the expert testimony or to the jury instructions on damages. The majority states that because plaintiffs "failed to raise this argument in their initial brief" they waived the issue on appeal. However, plaintiffs did raise the expert testimony argument on page 17 of its brief and made the jury instruction argument regarding punitive damages on page 28. While it is true plaintiffs did not make the jury instruction argument regarding compensatory damages until its cross-reply brief, I fail to see how this would preclude this court from considering the jury instruction and the fact that defendant never objected to it. In fact, I believe it is the first thing this court should have considered once defendant made its damage argument. Since the majority did not, I consider it now.

"(15) If you decide for the plaintiffs on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate them for any damages proved by the evidence to have resulted from the alleged misstatements of the defendant.

Evidence on the following types of damages has been presented: Profits Plaintiffs lost when SK was sold to Falcons.

Whether any damages have been proved by evidence is for you to determine.

(16) Damages for fraud may include lost profits. Such damage is the amount of *reasonable certain* net profits the plaintiffs did not earn as a result of defendant's wrongful conduct. *Absolute certainty as to the amount of lost profits is not required, but speculative profits cannot be awarded. Lost profits must be proved with reasonable certainty.*" (Emphasis added.)

The rule applicable to this case was correctly stated in the *agreed* jury instruction and the trial judge's decision. *Absolute certainty* as to the *amount* of lost profits is *not* required. Plaintiffs' lost profits were not speculative, they were real. All the law requires, in cases of

this character, is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages. *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289, 115 N.E. 389, 390 (1917).

It should also be remembered that the $4 million compensatory award was not based on lost operating profits; the jury rejected that basis for damages. The basis for the jury's compensatory award was lost sales. Those lost sales produced compensatory damages in the reduced value of the company and, thus, a lower profit when they sold the company than would have been the case in the absence of defendant's fraud.

Furthermore, I believe there are procedural reasons why the jury's and the trial judge's $4 million compensatory award should stand on appeal. It was not until the verdict that defendant raised the legal arguments presented in this appeal. Until then, defendant had tacitly conceded that plaintiffs' damage evidence, if believed by the jury, would be legally sufficient. This concession is established by the following procedural events as shown by the record.

Although defendant made three motions *in limine*, none made reference to plaintiffs' evidence of compensatory damages, and defendant did not object to plaintiffs' damage experts when they were called at trial. Nor did defendant raise the matter of compensatory damages when it moved for a directed verdict at the close of plaintiffs' case in chief. On the contrary, defendant's motion for a directed verdict at that point only argued that plaintiffs had waived their right to consequential damages by proceeding to arbitration.

At the close of all the evidence, defendant again moved for a directed verdict and again there was no argument against compensatory damages. I see defendant's appeal to this court as nothing more than an attempt to retry the case, which is what the majority has done. It is not our role to brandish exhibits and reconsider properly given jury instructions that were agreed to by the parties.

I remind the majority of the standards of review to which we are held. A verdict is against the manifest weight of the evidence only where the opposite conclusion is clearly evident, plain and undisputable, or where the findings are unreasonable, arbitrary and not based on any evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13 (1992); *Anderson v. Beers*, 74 Ill. App. 3d 619, 623, 393 N.E.2d 552, 555 (1979). The trial court denied defendant's new trial request and that ruling cannot be disturbed absent a clear abuse of discretion. *Maple*, 151 Ill. 2d 445, 603 N.E.2d 508; *Reideelberer v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 548, 416 N.E.2d 268, 270 (1981). The majority has failed to show the abuse of discretion here.

Furthermore, even if the compensatory damage amount was speculative, there is no basis for overturning the punitive award, because it is clear plaintiffs suffered some amount of compensatory damage as a result of defendant's fraud. Defendant's fraud actually caused two types of harm to plaintiffs. An immediate injury in the form of an overpayment, which the arbitrator valued at $1.3 million upon which the federal district court entered judgment, and a consequential injury, which the jury valued at $4 million 11 years later.

Only injury is required to support an award of punitive damages. The case of *Kemner v. Monsanto Co.*, 217 Ill. App. 3d 188, 576 N.E.2d 1146 (1991), cited by the majority, does not support the proposition that the punitive damage award must be reversed. There, the appellate court disallowed punitive damages only because it was "not a case where there was an intentional tort alleged nor a case where damages could not be easily compensated." 217 Ill. App. 3d at 200. In the case at bar, there was an intentional tort and it is defendant who contends that plaintiffs' damages could not easily be computed. Accordingly, *Kemner* stands for the proposition that compensatory damages are not an essential predicate to punitive damages in intentional tort cases like this one.

I can only guess to what effect defendant's argument regarding punitive damages had on the majority opinion. Although the majority never reaches this issue, I cannot leave this case without stating my belief that the trial court's remittitur had no basis in law. The Illinois Supreme Court has *never* reduced a jury verdict for punitive damages. The supreme court has either upheld or rejected such awards in their entirety. But it has never done what the trial court did here. Defendant does cite two cases in which Illinois appellate courts have reduced jury verdicts: *Stambaugh v. International Harvester Co.*, 106 Ill. App. 3d 1, 435 N.E.2d 729 (1982), and *Brown v. Farkas*, 158 Ill. App. 3d 772, 511 N.E.2d 1143 (1987). Both are appellate verdicts giving no reason whatever for the "judicial" action taken.

The Illinois law is quite plain: Juries' punitive awards are to be reviewed only for "passion, partiality or corruption." *Deal v. Byford*, 127 Ill. 2d 192, 204, 537 N.E.2d 267, 272 (1989). Defendant has never contested that the instant verdict was the product of "passion, partiality or corruption." Those words do not appear in defendant's post-trial filings and they have not been used in this appeal. Moreover, Illinois law is equally clear that the measurement of punitive damages "is peculiarly within the province of the jury." *Collins v. Interroyal Corp.*, 126 Ill. App. 3d 244, 257, 466 N.E.2d 1191, 1200 (1984).

The trial court reviewed the jury's punitive award under the "*Proctor* factors." However, no Illinois authority for the application of these factors exists. The 1994 *Proctor* decision was subsequently withdrawn by the court, and thus, has no precedential value. The real Illinois law under which the jury verdict must be reviewed is stated in the jury instruction, *which defendant proposed*, and plaintiffs agreed to. "In assessing punitive damages, you the jury, can properly consider the following factors: 1) the nature and enormity of the wrong; and 2) the financial status of the defendant."

Applying this law to this case, we see at once that the $50 million verdict was appropriate. Furthermore, this award is consistent with the substantive due process standard, with regard to punitive awards, recently set by the United States Supreme Court in *BMW of North America, Inc., Petitioner v. Ira Gore, Jr.*, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996). In *BMW*, the Supreme Court considered three guideposts in determining whether the award was "grossly excessive." These were: the degree of reprehensibility of the defendant's conduct, the ratio of the punitive award to the actual harm inflicted, and the civil and criminal penalties that could be imposed for comparable misconduct. *BMW*, 517 U.S. at 574-75, 134 L. Ed. 2d at 826-27, 116 S. Ct. at 1598-99. In that case, the Supreme Court found a punitive award of $2 million grossly excessive where BMW had repaired redelivery damage to plaintiff's car without disclosing such repairs, and the conduct resulted in actual damages of only $4,000. *BMW*, 517 U.S. at 574-75, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598.

The case before us is clearly distinguishable in that defendant's conduct was much more reprehensible than BMW's, and the civil and criminal penalties for such conduct are potentially great. Here the punitive award is only 12 times the compensatory award, as opposed to the punitive award in *BMW*, which was 500 times the actual damages.

For all of these reasons, I would affirm the jury verdict award of $4 million in compensatory damages and $50 million in punitive damages and reverse the trial court's remittitur.